# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JOVAN MOSELY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 06 C 6314 |
| | ) | |
| | ) | Judge David H. Coar |
| | ) | |
| CITY OF CHICAGO, CLARENCE | ) | Magistrate Judge Jeffrey Cole |
| HILL, MAVERICK PORTER, DERAIL | ) | |
| EASTER, CHARLES WILLIAMS, | ) | |
| EDWARD HOWARD, JR., Officers | ) | |
| of the Chicago Police Department, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## BACKGROUND

Fifty-one year old Howard Thomas was savagely beaten to death for $7 and a bottle of pop one melancholy night in August of 1999 as he was returning home from work. Jovan Mosely admits he was present at the murder, but insists he did not participate with his three companions as they pummeled Mr. Thomas with their fists or when they clubbed him repeatedly with a baseball bat. He was, he says, an innocent spectator. Mr. Mosely was arrested and charged with murder and spent the next five years in jail awaiting trial. His three co-defendants were convicted of first degree murder; Mosely was acquitted. Now he is suing the City of Chicago and five Chicago Police Department officers under 42 U.S.C. §1983, charging them with having violated his constitutional right to a fair trial by failing to disclose exculpatory evidence as they were required to do under *Brady v.*

*Maryland,* 373 U.S. 83 (1963), by coercing him to confess to the murder, by destroying reports that would have reflected physical and mental abuse by the defendants, by lying to the grand jury that Mosely had been identified as a participant in the crime when he had not, and by fabricating a line up report to suggest that plaintiff was identified as a participant in the murder when precisely the opposite had occurred. (Complaint, ¶3).

In September 2006, about a year after Mosely's acquittal, Katherine Millett, wrote an article in Chicago Magazine. Entitled "Long Time Coming," the article's primary focus was Mr. Mosely's extended stay in prison, notwithstanding Illinois' speedy trial act. It called into question the supposed "clubby collegiality" among prosecutors and public defenders that gives them, the article said, a shared interest in processing defendants through a system that was designed to be adversarial, but in which "local judges typically do little to speed things along." The result, the article concluded, was "inertia, and the cost of maintaining it is borne by the accused, who may languish behind bars for years before answering the charges against them in court." In this "dysfunctional system, the right to a speedy trial can become a joke." (Defendants' Motion to Compel Compliance With Records Subpoena And Motion For Issuance Of A Rule to Show Cause, Ex. A, 48, 50).[1] So it was,

---

[1] The application for a rule to show cause is superfluous in light of Rule 7(b) of he Federal Rules Of Civil Procedure. *See Application of Tracy,* 106 F.2d 96, 98 (2d Cir.1939) (Clark, J., concurring) ("An unnecessary appearance of irregularity was given the proceedings below by the fact that formal orders to show cause..., were procured, whereas simple notices of motions would have been preferable. The new Federal Rules of Civil Procedure attempt to limit to a minimum these unnecessary formalities which take up the time of judges and add nothing of value to the proceedings. Here the order to show cause on the motion to quash was simply a somewhat peremptory notice of motion.... Since such orders to show cause serve only to confuse, judges might well decline to sign them except when really required by or justified under binding rules of procedure."); *SEC v. VTR, Inc.,* 410 F.Supp. 1309, 1313 n. 3 (D.D.C.1975).

the article concluded, in Mr. Mosely's case, where "[t]he phrase 'continued by agreement' appear[ed] a staggering 75 times on Mosely's docket sheet." *Id.* at 50.

In response to defendants' interrogatories, Mr. Mosely identified Ms. Millett as a witness and Chicago Magazine as a source to support his contention that the prosecution in his criminal trial did not call Gregory Reed as a witness because he had been intoxicated at the time he gave a statement to the police naming Mr. Mosely as a participant in the murder. That, in part, triggered the defendants' subpoenas. Also, there was Ms. Millett's roster of interviewees, who the plaintiff identified as potential witnesses in the trial in the case. In addition to Mr. Mosely, there were Andrew Varga, Ethan Holland and James Lynch who were the prosecutors in the murder case; James Fryman and Edwin Korb, who were Mr. Mosely's public defenders; and Catherine O'Daniel and Laura Caldwell, Mr. Mosely's private defense attorneys, who succeeded Messrs. Fryman and Korb and tried the case.

The subpoenas to Ms. Millett and Chicago Magazine ("Respondents") demanded the production of:

> Any and all documents, notes (including interview notes), drafts, writings, reports, correspondence, audio tapes, video tapes, computer files, emails, correspondence and any written or recorded item, whether in written, electronic, audio or other reproducible format, in your possession regarding or relating in any way to your involvement in writing, preparing, editing or publishing the article titled: "Long Time Coming" by Katherine Millett, Chicago Magazine, September 2006.

The defendants also seek an order requiring Ms. Millett to be deposed at the close of discovery.

The defendants insist that the Respondents have "information and evidence directly related to key allegations in plaintiff's complaint," including whether the defendants informed prosecutors of exculpatory evidence, what prosecutors and defense attorneys knew in regard to witness'

statements, and whether the defendant's post-arrest questioning of Mr. Mosely was coercive. (Motion to Compel at 2). Ms. Millett and Chicago Magazine have objected to the subpoenas, contending that they have no relevant information, that what they have is protected by the journalist's common law qualified privilege (that has been recognized by some Circuit Courts of Appeals, but rejected by the Seventh Circuit) and by the Illinois qualified journalist's privilege. In addition, they argue that requiring them to produce anything would be unduly burdensome.

For the purposes of this motion, the defendants have whittled down their request to:

any audio or video recordings made of any known, identified source in the article; any notes and/or summaries of conversations with Mr. Mosely made in connection with the article; any notes and/or summaries of conversations with prosecutors Andrew Varga, Ethan Holland, James Lynch made in connection with the article; any notes and/or summaries of conversations with defense attorneys, Edwin Korb, James Fryman, Catherine O'Daniel, Laura Caldwell, made in connection with the article.

Although Ms. Millet was originally listed as a prospective witness, Mr. Mosely's counsel has now stipulated that he will not call her as a witness at trial, and that "the discovery response identifying of [sic] Katherine Millett and the Chicago Magazine article . . . is limited to the content of the article as published . . . ." (Plaintiff's Response at 1; Stipulation ¶1). This stipulation "grew out of" conversations between plaintiff's counsel and counsel for Ms. Millett and Chicago Magazine.[2] The Respondents have not altered their position and have failed to even provide a privilege log, as required by Rule 45, Federal Rules of Civil Procedure.

---

[2] At a hearing on August 1, 2008, in response to my questions, counsel for the plaintiff and Respondents said that after the defendants' motion to compel was filed, they had discussions about the subpoena and Ms. Millett's knowledge of things. The hearsay rule apparently was discussed. "Growing out of" that conversation (and prior to the defendants' reply brief) the stipulation was filed by plaintiff's counsel.

## ANALYSIS

### A.
### The Reporter's Privilege Objection

### 1.

Respondents claim protection under both a state law and federal common law journalist's privilege. Illinois has a statutory reporter's privilege, 735 ILCS 5/8-901,[3] but as this is a federal-question case, it is inapplicable. *See McKevitt v. Pallasch*, 339 F.3d 530, 533 (7th Cir. 2003); *United States v. Bek*, 493 F.3d 790, 801 (7th Cir. 2007); *Dunn v. Washington County Hosp.*, 429 F.3d 689, 693 (7th Cir. 2005). The Respondents' contention that *McKevitt* expressly declined to consider whether the privilege was applicable in a federal case because the reporters waived it (*Response Memorandum in Opposition to Defendants' Motion to Compel*, at 4, 11), is mistaken and ignores *McKevitt's* unequivocal statement that "[s]tate-law privileges are not 'legally applicable' in federal-questions cases like this one." 339 F. 3d at 533.[4] *Accord, Whitmore v. Walker*, 2008 WL 687005 (S.D.Ill. 2008); *Patterson v. Burge*, 2005 WL 43240 at *1 (N.D.Ill.2005); *Solaia Technology, LLC v. Rockwell Automation, Inc.*, 2003 WL 22597611 at *2 (N.D.Ill. 2003).

Moreover, the argument's invalidity is apparent when the procedural posture of *McKevitt* is examined. Pursuant to 28 U.S.C. §1782(a), the district court had ordered production of tape recorded interviews by a journalist of the chief witness against a person charged with international

---

[3] Section 901 prohibits compelled disclosure of a reporter's source unless, pursuant to §8-906, the court concludes that disclosure is appropriate, having due regard to the nature of the proceedings, the merits of the claim or defense, the adequacy of the remedy otherwise available, the relevancy of the source and the possibility of establishing by other means that which it has alleged the requested source will tend to provide.

[4] While waiver was discussed in *McKevitt*, it provided only secondary support for the court's holding, as evidenced by the court's statement that "even if the statute [735 ILCS 5/8-901] were applicable," the reporters waived it.

terrorism, who was to be tried abroad. Section 1782(a) permits a district court to order production of a document for use in a proceeding in a foreign tribunal unless production would violate "any legally applicable privilege." *McKevitt* upheld the district court's order requiring production of the tapes. It could not have done so and still have reserved the question of whether the Illinois statutory privilege was applicable in the case.

The same is true of the federal common law journalist's privilege. But one need not leave the matter to inevitable inference. Surveying the cases that recognized a common law reporter's privilege in the wake of *Branzburg v. Hayes*, 408 U.S. 665, 683 (1972), Judge Posner's panel opinion in *McKevitt* concluded that those courts that had recognized the privilege had done so "rather surprisingly" in light of *Branzburg*. Some, he pointedly said, have "audaciously" declared that *Branzburg* even created a privilege – and that they "essentially ignore[d] *Branzburg*," and could "certainly be questioned." *McKevitt*, 339 F.3d at 533.[5] He concluded that "the cases that extend the [reporter's] privilege to non-confidential sources that express concern with harassment, burden, using the press as an investigative arm of government, and so forth" may be "skating on thin ice"

---

[5] It has been observed that "Posner is an unusually influential judge, and the rest of the federal judiciary has lined up behind him to deny reporter's privilege cases for the last three years." Lucy A. Dalglish and Casey Murray, *Déjà Vu All Over Again: How A Generation of Gains In Federal Reporter's Privilege Law Is Being Reversed*, 29 Univ of Ark. at Little Rock L. Rev., 13, 39 n. 207 (Fall 2006). The first part of the sentence is accurate, the second not quite so. *See e.g., In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141 (D.C. 2006), which generated three separate opinions. Judge Sentelle held that there is no reporter's common law privilege. Judge Tatel concluded that there is. Judge Henderson found it unnecessary to reach the question.

That other circuits have recognized a reporter's privilege (Response Memorandum at 10) is not pertinent here. *McKevitt* rejected those holdings, and that is the end of the matter. Ours is a hierarchical judicial system, and judges of inferior courts must follow decisions of their superiors in that system. *Gacy v. Welborn*, 994 F.2d 305, 311 (7th Cir. 1993).

since these considerations were rejected by *Branzburg* even in the context of a confidential source. 339 F.3d at 533

In addition, there is *United States Dept. of Educ. v. National Collegiate Athletic Ass'n.*, 481 F.3d 936 (7th Cir. 2007), which rejected the National Collegiate Athletic Association's attempt to thwart a subpoena by asserting an investigatory privilege. The court acknowledged that the attorney-client privilege can embrace such a privilege, but said "there is nothing like that in this case. *There isn't even a reporter's privilege in federal cases.* [citing *Branzburg, University of Pennsylvania v. EEOC*, 493 U.S. 182, 201 (1990), and *McKevitt* ]." 481 F.3d at 938 (Emphasis supplied). Whatever else may be said, *United States Department of Education* certainly did not leave open the question of the existence of a reporter's privilege in federal cases, as the Respondents have claimed. Indeed, it is a contradiction in terms to say that a case that explicitly and unequivocally adverted to the absence of a reporter's privilege in federal cases and cited one of its earlier opinions that squarely decided the issue left that very issue open.

## 2.
### Respondents Have Waived Any Privilege They Might Have Had By Not Complying With Rule 45 Of The Federal Rules Of Civil Procedure

The Respondents have not provided a privilege log itemizing the documents for which they have claimed a privilege even though Rule 45(d)(2)(A)(ii) requires that a person withholding subpoenaed information under a claim of privilege must:

> describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

The requirement corresponds to Fed.R.Civ.P. 26(b)(5). *See* Advisory Committee Notes to 1991 Amendments to Fed.R.Civ.P. 45(d). Just as Rule 26(b)(5) requires parties lodging a claim of

privilege against a discovery request to compile a privilege log, Rule 45(d)(2)(A)(ii) imposes the same obligation on nonparties responding to subpoenas. *Hobley v. Burge*, 433 F.3d 946, 947, 951 (7th Cir. 2006); *In re Subpoena Duces Tecum Issued to Commodity Futures Trading Com'n*, 439 F.3d 740, 751 (D.C.Cir. 2006).

The Respondents' justification for this failure is explained in a brief footnote in their Response Memorandum, which asserts that they are excused from compliance with Rule 45 because they *"have* no audiotapes of an interview with the Plaintiff." (*Id.* at 6, n.4)(Emphasis supplied). The claim is not convincing. Its only support is Ms. Millett's affidavit, which says that *she* "do[es] not *have* audio tapes of [her interviews] with Jovan Mosely." (Response Memorandum, Ex. D, ¶6)(Emphasis supplied). Her affidavit says nothing about Chicago Magazine, and, in any event, she cannot speak authoritatively for it since she is not even an employee of the magazine. Hence the statement in the Response Memorandum that *Chicago Magazine* does not have audiotapes of interviews is unsupported, and unsupported statements in briefs do not count. *See IFC Credit Corp. v. Aliano Brothers General Contractors, Inc.*, 437 F.3d 606, 610-611 (7th Cir.2006); *United States ex rel. Feingold v. AdminiStar Federal, Inc.*, 324 F.3d 492, 494 (7th Cir.2003); *Car Carriers Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984).

Moreover, as a "freelance journalist for over eight years, and as a graduate of the University of Chicago Law School and a practicing lawyer for ten years (Millett affidavit., ¶¶1-2), it may reasonably be assumed that Ms. Millett's choice of the word "have" was purposeful, and one ought not read more into her carefully drafted statement than normal usage requires. It is significant that she does not say that the tapes do not exist or that they are not in the possession of Chicago Magazine (or someone else) or that she could not, if she chose, secure possession of them. She

8

merely states that *she* presently does not "have" them. But all that is required is that she have the ability to produce them. If in fact the audio tapes do not exist, it would have been simplicity itself for the Respondents to have said so in a way that did not leave the matter to conjecture. The Respondents may file within 14 days separate, supplemental affidavits making clear whether the tapes exist, and if they do not, explaining the circumstances surrounding their loss or destruction.

Lastly, the excuse offered in the Response Memorandum puts out of view Ms. Millett's interview notes. There is no claim that the notes do not exist or that they are not in the possession, custody or control of one or both of the Respondents, and no justification is offered for the Respondents' non-compliance with Rule 45 as it relates to the notes. In short, the explanation for not having produced a privilege log for the audiotapes is insufficient as it relates to Ms. Millett, is non-existent as it relates to Chicago Magazine, and is non-existent as it relates to both Respondents and the interview notes.

As indispensable as is the role of the press in a free society, journalists and the media have "no special immunity from the application of general laws." *Branzburg*, 408 U.S. at 683; *McKevitt*, 339 F.3d at 533. *See also Herbert v. Lando*, 441 U.S. 153 (1979). By failing to comply with Rule 45, the Respondents have waived whatever claim of privilege they might have had in the tapes and interview notes. *See* Advisory Committee Notes to 1991 Amendments to Fed.R.Civ.P. 45(d); *Ventre v. Detronic Rental Corp.*, 1995 WL 42345, *4 (N.D.Ill. 1995); *Ost-West-Handel Bruno v. M/V Pride of Donegal*, 1997 WL 231126, *1 (S.D.N.Y. 1997); 9C Wright &. A. Miller, *Federal Practice and Procedure* § 2464, 523-25 (3d ed. 2007).

9

**B.**

**In This Circuit, Subpoenas Directed To Journalists And The Media, Like Those To Any Non-Party, Need Only Be "Reasonable In The Circumstances"**

*McKevitt* teaches that undue burden, like negligence, does not exist in the air, and that subpoenas to journalists are not to be subjected to an analysis under Rule 45 that differs from that applied when the subpoena is directed to a non-journalist:

> It seems to us that rather than speaking of privilege, courts should simply make sure that a subpoena duces tecum directed to the media, *like any other subpoena duces tecum*, is reasonable in the circumstances, which is the general criterion for judicial review of subpoenas. [citations omitted]. We do not see why there need to be special criteria merely because the possessor of the documents or other evidence sought is a journalist."

339 F.3d at 533 (Emphasis supplied).

In essence, *McKevitt* refused, to use Phillip Toynbee's classic phrasing, to "deal with the complexity of life by a single supreme simplicity." Toynbee, *Two Kinds of Extremism*, London Observer, Feb. 8, 1959 at 20, col. 5-6, *quoted* in P. Freund, *Mr. Justice Frankfurter*, in Felix Frankfurter: A Tribute, 158 (W. Mendelson ed. 1964). Instead, it left it to the discretion of district judges to determine whether a subpoena is "reasonable" in light of all of the myriad circumstances that each case presents. 9 Moore's Federal Practice, §45.04[3][b][iv] (3rd ed. 2004).[6]

Since "[q]uestions of reasonableness are necessarily questions of relation and degree," *Sugar Institute v. United States*, 297 U.S. 553, 600 (1936), there can be "'no formula for determining reasonableness.'" *United States v. Banks*, 540 U.S. 31, 36 (2003). Thus, no category of information

---

[6] *Compare Samson v. California*, 547 U.S. 843, 848 (2006)('[U]nder our general Fourth Amendment approach" we "examin[e] the totality of the circumstances" to determine whether a search is reasonable within the meaning of the Fourth Amendment.").

or class of witness is immune from subpoena. Otherwise we would have a *per se* rule rather than a discretionary choice.

Relevant to an exercise of discretion under Rule 45 are the following somewhat overlapping considerations: the likelihood that compliance will result in production of the information, whether the discovery is unreasonably cumulative or duplicative, whether the information sought is readily obtainable from another, more convenient, less burdensome (but equally reliable) source, and whether the burden of the proposed discovery outweighs its likely benefit. *See Northwestern Memorial Hospital v. Ashcroft,* 362 F.3d 923, 927 (7th Cir.2004); *Watts v. S.E.C.,* 482 F.3d 501, 509 (D.C. Cir. 2007); *Exxon Shipping Co. v. U.S. Dept. of Interior,* 34 F.3d 774, 780 (9th Cir. 1994). The discretionary determination of reasonableness in the context of Rule 45 is not unlike the discretionary balancing of harms involved in determining whether to grant injunctive relief, which, the Seventh Circuit has said, is "not mathematical in nature," but rather "'is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations . . . .'" *Ty, Inc. v. The Jones Group, Inc.,* 237 F.3d 891 (7th Cir. 2001).[7]

We begin with that aspect of the subpoenas requiring production of tapes and interview notes of the prosecutors and defense lawyers in the criminal case against Mr. Mosely. They have been identified as potential witnesses, although none has first hand knowledge of any of the events that form the basis of Mr. Mosely's §1983 claim.

---

[7] On virtually identical facts, two decision-makers can arrive at opposite conclusions, both of which constitute appropriate exercises of discretion. *Compare United States v. Boyd,* 55 F.3d 239 (7th Cir. 1995) with *United States v. Williams,* 81 F.3d 1434, 1440 (7th Cir. 1996). *Cf. United States v. Bullion,* 466 F.3d 574, 577 (7th Cir. 2006)("The striking of a balance of uncertainties can rarely be deemed unreasonable...."). An abuse of discretion occurs only when no reasonable person could take the view of the district court. *United States v. Re,* 401 F.3d 828, 832 (7th Cir.2005).

**1.**

**The Tapes And Notes Of Ms. Millett's Interviews Of The Prosecutors And
Defense Lawyers In The Criminal Case Against Mr. Mosley**

The analysis of the reasonableness of the subpoenas may properly begin by reviewing the

statements made by the prosecutors and defense lawyers as quoted in Ms. Millett's article. If nothing

in the article reflects statements by the lawyers in the murder case that involve Mr. Mosely's claims

that he was framed by the defendants and coerced into making a confession, it becomes exceedingly

unlikely that the subpoenaed information will contain any relevant information within the meaning

of Rule 26. *See Fox v. Township of Jackson*, 64 Fed.Appx. 338, 2003 WL 1971833 at *2 (3rd Cir.

2003)(quashing subpoena where the "information contained in the article was not specific enough

to lead the reader to believe that the reporter possessed any relevant and unique information from

her conversation with [the interviewee]."). And if that be true, an appropriate exercise of discretion

is not to enforce the subpoena as it relates to the notes or tapes of interviews of the lawyers in the

criminal case.

In *Northwestern Memorial Hospital*, the government sought patient records on the theory that

they might contain information useful for cross-examining a critical witness, Dr. Hammond, who

had "made assertions of fact about his experience and his patients," which plaintiffs were using to

support their legal position. The government argued it should be permitted to test those assertions,

and it wanted the patient records to see whether they contained statements useful for that purpose.

It was not that the endeavor was a "fishing expedition"–all pre-trial discovery is, as the court held.

Rather, the problem was that the government had not indicated what assertions these were or how the records might bear on them.[8]

The district court contrasted the dearth of probative value "with the potential loss of privacy that would ensue were these medical records used in a case in which the patient was not a party and concluded that "the balance of harms resulting from disclosure severely out-weighed the loss to the government through non-disclosure." 362 F.3d at 927. Judge Posner's panel opinion held that "[t]hese findings were solidly based." As he explained, the information sought by the government's subpoena "would be unlikely to be found in Hammond's records," and would be "much more likely to be found in the records" that "the government didn't seek."

As the court stressed, although on appeal the Hospital repeated at length its reasons for believing that the records sought by the government would have little or no probative value, the government's opening and reply briefs remained vague "to the point of being evasive." 362 F.3d at 927. *See also Bond v. Utreras*, 2006 WL 1806387 at * 6 (N.D. Ill. 2006)("The defendants have not explained why, specifically, they need the interview notes or tapes-what those might add to the mix."); *Builders Ass'n of Greater Chicago v. County of Cook*, 1998 WL 111702, 6 (N.D.Ill. 1998)("Because the Urban League study will not be offered for the truth of the matter asserted-that there existed racial discrimination in the industry in 1993-and plaintiff provides no other reason for

---

[8] After *Northwestern Memorial Hospital*, it is no longer an answer in a discovery dispute to brand the endeavor a "fishing expedition." That is the purpose of discovery, and "[o]ne can't "know what one has caught until one fishes. But Fed.R.Civ.P. 45(c) allows the fish to object, and when they do so the fisherman has to come up with more than" showing that the information sought is relevant. The benefits of the requested production must outweigh the burden of compliance with the subpoena." 362 F.3d at 927, 930-931.

needing discovery in regard to the limited use that might be made of the Urban League study at trial, we grant the Urban League's motion to quash subpoena duces tecum.").

With the exception of the lawyers who represented Mr. Mosely at trial -- Catherine O'Daniel and Laura Caldwell -- Ms. Millett's article was critical of Mr. Mosely's public defenders and either faintly critical of or neutral toward the prosecutors. Putting to one side the fact that Mr. Mosely has stipulated that Ms. Millett will not be a witness, her comments in the article about the lawyers and the continuances in the criminal case are not relevant to the claims or defenses in the instant case. Moreover, the article contained no statements by the prosecutors or defense counsel remotely connected with Mr. Mosely's claim that he was framed by the defendants and coerced into falsely confessing to the murder of Mr. Thomas.

According to the article, Edwin Korb, Mr. Mosely's first public defender, agreed to dozens of continuances, but filed only a single motion. He is quoted as saying that he waited two years to interview a witness until she became emancipated from her father, a police officer. Nothing in the article suggests that Mr. Korb discussed the merits of the case with Ms. Millett. The article recites only Mr. Korb's strategic reasons for not demanding trial, which are not relevant to Mr. Mosely's claims here. Mr. Korb's successor, James Fryman, was charged in the article with having agreed to monthly continuances over the next three years with "no compelling reasons, [and] with no explanation appearing in the record about the nature of the requests or the name of the party making them." Mr. Fryman's explanation of why Mr. Mosely's case dragged on for so long was discussed. But the number of or reasons for the many continuances is not part of Mr. Mosely's §1983 claim, and in any event, the facts about their number or duration are undisputed.

As with Mr. Korb, nothing in the article suggests that Ms. Millett had any discussions with Mr. Fryman about post-arrest interrogations or the other allegations of police misconduct in Mr. Mosely's complaint, and it is inconceivable that either Mr. Korb or Mr. Fryman would have violated their attorney-client privilege and revealed to Ms. Millett any confidence from Mr. Mosely, let alone any that would have been in any way detrimental to him and useful to the defendants either as an admission or a prior inconsistent statement, *see* Rules 613, 801(d)(2), Federal Rules of Evidence, which is the explicit rationale upon which the subpoenas and the Motion to Compel are based as they relate to the interviews of Mr. Mosley. (*Motion to Compel*, at 9). [9]

Catherine O'Daniel succeeded Mr. Fryman in early 2005. Of course, as with Mr. Korb and Mr. Fryman, nothing in the article suggests that she revealed any confidences imparted to her by Mosely. Nor could she without violating the attorney/client privilege. She did discuss how she brought her friend, Laura Caldwell, into the case to assist her, and expressed her very favorable opinion of Mr. Mosely. There is nothing in statements attributed to Ms. O'Daniel that touches on

---

[9] Curiously, the reply brief can be read to have disavowed this theory, for it argued that the subpoenaed information is needed not for impeachment, but only to respond to the article, itself, which the defendants apparently believed, based upon the language of the Stipulation, will be offered as evidence. (Reply at 5). But this odd argument would necessarily result in denial of the Motion to Compel, because the information sought would be unnecessary since newspaper articles are "classic, inadmissible hearsay" when offered to prove the truth of the matters asserted–including whether a statement was even made by the person quoted. *See Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir 2005). *Accord Chicago Firefighters Local 2 v. City of Chicago*, 249 F.3d 649, 654 (7th Cir. 2001); *Larez v. City of Los Angeles*, 946 F.2d 630, 642 (9th Cir.1991); *United States v. Baker*, 432 F.3d 1189, 1211-1212 (11th Cir. 2005).

Any attempt by Mr. Mosely to introduce in his direct examination statements to Ms. Millett that were consistent with his direct testimony would be precluded by the prior consistent statement doctrine. The same is true even if on cross examination of Mr. Mosely there was a suggestion of recent fabrication since the statements to Ms. Millett would not have antedated a motive to falsify, and thus would be inadmissible. *See* Rule 801(d), Federal Rules of Evidence; *Tome v. United States*, 513 U.S. 150, 157-158 (1995); *Gauthier v. Mekusker*, 186 Fed. Appx. 903 (11th Cir. 2006); 5 Weinstein's Federal Evidence, §801.22 [2]-[3].

any aspect of the trial except a reference to her advice to Mosely that he not testify. But the attorney-client privilege would bar any inquiry on that topic, and the defendants make no argument that they seek discovery to explore it.

Ms. Millett's article also briefly mentions the prosecutors, Andrew Varga, Ethan Holland and James Lynch. Mr. Varga is quoted as saying that a Mr. Corleone had retracted certain statements that he had made to the police and admitted having been drunk the night that he made the statements and that as a consequence, he was not called to testify. This, however, has nothing to do with Mr. Mosely's claims in this case. The only mention by any of the lawyers of the police interrogation was Mr. Varga's expression of his personal "opinion" that he thought it "unlikely" that there was the kind of coercive interrogation claimed by Mosely. Quite obviously, that opinion was not based on anything Mr. Mosely said to him, for he never interviewed Mosely and Mosely did not testify at trial. In short, there is nothing to suggest that he imparted to Ms. Millett any information, not otherwise known to the defendants, that would lead to admissible evidence to be used for impeachment of or an admission by Mr. Mosely. There is nothing in the article that suggests that Ms. Millett even spoke with Holland or Lynch, or if she did so, that they have any information not known or otherwise available to the defense.

The Advisory Committee notes to the 1991 Amendment to Rule 45 caution that a subpoena should be quashed "unless the party serving the subpoena shows a substantial need...." *See also* 9A C. Wright & A. Miller, Federal Practice and Procedure: Civil 3d §2463.1 at 512 (2008). The defendants have not shown a substantial need for Ms. Millett's interview notes or tapes of interviews of Ms. O'Daniel, Mr. Korb, Mr. Varga, Mr. Fryman, Ms. Holland, Mr. Lynch or Ms. Caldwell Nothing in the Motion to Compel or the reply brief offers any explanation of what information might

16

have been imparted to Ms. Millett by the lawyers in the criminal case--or the other people mentioned in the article who commented on delays in the criminal courts--that reasonably might lead to admissible evidence for the defense. It is pointless to pursue the circuitous path of requiring production of Ms. Millett's interview notes or tapes, which can only lead back to the lawyers in any event. Each can be informally interviewed if they are willing and deposed if they are not, and it is what they know, not what they said to Ms. Millett that counts.[10]

The Supreme Court has cautioned that the requirement of Rule 26(b)(1) that the material sought in discovery be "relevant" should be firmly applied, and the district courts should not neglect their power to restrict discovery where "justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." Rule 26(c). With this authority at hand, judges should not hesitate to exercise appropriate control over the discovery process." *Herbert v. Lando*, 441 U.S. 153, 177(1979). Thus, the subpoenas will not be enforced to the extent they seek tapes or notes of interviews of the prosecutors and defense lawyers in the criminal case or others mentioned in the article. It remains to consider the audiotapes and interview notes as they relate to Mr. Mosely. As to him, the analysis is more complicated.

---

[10] Ms. Millett's notes or summaries of interviews are inadmissible hearsay. Rule 801, Federal Rules of Evidence. And even if her notes could be shown to fall with the records of regularly conducted activity exception under Rule 803(6), they would not be admissible as to any of the interviewees' statements, except Mr. Mosely's, because of the hearsay within hearsay problem. See Rule 805, Federal Rules of Evidence; *Hoselton v. Metz Baking Co.*, 48 F.3d 1056, 1061 (8th Cir.1995); 4 Weinstein's Evidence, § 803.08[2] at 803-58.2.

## The Tapes Of Interviews Of Mr. Mosely

Ms. Millett's article reveals that she had conversations with Mr. Mosely about what occurred during the beating of Mr. Thomas on August 6, 1999 as well as his arrest and subsequent treatment by the police officers, leading to his confession. As these are the events that are at the epicenter of his complaint in this case, (Complaint ¶3), the criticality of Mr. Mosely's statements to Ms. Millett on these issues is beyond debate. *See McKevitt*, 339 F.3d at 531 (the tape recordings of key prosecution witness against the party seeking their production). Mr. Mosely will be the central witness in the case, and its outcome may hinge in large measure on the defendants' ability to effectively cross-examine him. A component of that exercise is to point out to the jury statements made that would be inconsistent with Mr. Mosely's version of events. Unlike the situations in *Northwestern Memorial Hospital, Hobley,* and *Patterson*, there is every reason to conclude that the subpoenaed information is likely to contain critical information that could constitute or lead to admissible evidence.[11]

Of course, the trier of fact will be able to observe the demeanor of Mr. Mosely. But that does not in the slightest reduce the need for and relevance of the information that is being sought, for credibility involves more than demeanor. *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 575 (1985); *Indiana Metal Products v. N.L.R.B.,* 442 F.2d 46 (7th Cir. 1971 ). "Evidence to be worthy of credit" must not only be "'credible' in itself,'" but must proceed "from a credible

---

[11] The statement in the Response Memorandum that "Defendants [will not] find admissions from [Mr. Mosely] in the subpoenaed material" is unsupported and entitled to no weight. *See supra* at 8. It is significant that the Respondents have chosen to make the statement in a brief rather than an affidavit.

source...." *Geighy Chemical Corp. v. Allen*, 224 F.2d 110, 114 n.5 (5th Cir. 1955). Admission and prior inconsistent statements of a witness undermine credibility. *See United States v. Hale*, 422 U.S. 171, 176 (1975); *Harris v. New York*, 401 U.S. 222, 226 (1971); *Jones v. Wallace*, 525 F.3d 500, 504 (7th Cir. 2008).

It is difficult to see what burden production of any audio or videotapes of interviews of Mr. Mosely would impose on either of the Respondents, and the defendants have offered to pay any costs involved in complying with the subpoena. (Motion to Compel at 8). *McKevitt* sustained as "clearly sound" the district court's grant of an order to produce tape recordings of a key witness in the terrorism prosecution against McKevitt in Ireland that were made by journalists writing his biography. *Hobley v Burge*, 223 F.R.D. 499 (N.D. Ill. 2004) ordered the production of letters written by Mr. Hobley to a journalist, analogizing the letters to the tape recordings that were the subject of *McKevitt*. 223 F.R.D. at 504. *Solaia Technology* denied a motion to quash a subpoena that sought production of tapes of communications between Start Magazine and Rockwell Automation, because a "subpoena dues [sic] tecum requesting disclosure of such information [i.e. from a non-confidential source][cannot] be viewed as unreasonable." 2003 WL 22597611 at *2 .

The only burden claimed by the Respondents is Ms. Millett's prophesy that requiring any turnover of any sort by her to anyone in any case will have dire consequences for *her* future as a freelance journalist:

> "The possibility that I might have to turn over my interview notes or tapes to the government or to litigants in lawsuits would chill the process. It would impair my integrity as a journalist by essentially turning my interviews of sources into glorified depositions and turning me into an unwilling investigator of the litigants. It would cause sources to dry up, and ultimately would result in a loss of information to the public."

(Response Memorandum, Ex. C ¶4).

As a purely logical matter, Ms. Millett's statement is unconvincing. Publication of interviews with *non-confidential* sources is consistent with the expectation– if not the desire– of the interviewee that there be public dissemination. Anyone reading the interview intuitively understands that. The possibility that at some point in the future a journalist *might* have to make a further disclosure of that which either was already publically disclosed or could have been had the journalist decided to do so, does not change the essential nature of the understanding the interviewee and the journalist had or impose a risk meaningfully different from that which inhered in the interview. Consequently, it is illogical to argue that future non-confidential interviewees will be deterred from cooperating with Ms. Millett because she might have to reveal in the future something she had the absolute right to reveal in the first place. In short, the argument that Ms. Millett's "journalistic integrity" will be besmirched if the subpoena to her is enforced is unpersuasive.

It is also inaccurate to say that Ms. Millett's interviews of non-confidential sources will be turned into "glorified depositions" and that she will be turned into "an unwilling investigator of the litigants." Journalists alone determine the contours and content of their interviews, unaided and uninfluenced by lawyers in cases still in the womb of time and that may never be born. Thus, it a *non-sequitur* to say that Ms. Millett – in September, 2006 – was made the unwilling investigator for the lawyers in a case in which the Answer was not filed until February 2007 and the Motion to Compel was not made until May 2008.

The Ninth Circuit rejected this kind of argument in *In re Grand Jury Subpoena*, 201 Fed.Appx. 430, 433, 2006 WL 2631398,2 (9th Cir. 2006)(parenthesis in original):

20

"Wolf and *amici* also argue that the district court's order will have a chilling effect on Wolf's ability to gather news because groups will perceive him as being an investigative arm of the law. This argument has also been rejected by the Supreme Court. *See Branzburg*, 408 U.S. at 699-700 ('From the beginning of our country the press has operated without constitutional protection for press informants, and the press has flourished. The existing constitutional rules have not been a serious obstacle to either the development or retention of confidential news sources by the press.'). "

Ms. Millett's speculative statement does not comport with the kind of specific and particularized demonstration courts have required to establish burden or "good cause." *See generally Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16 (1981); *Trading Technologies Intern., Inc. v. eSpeed, Inc.*, No. 04 C 5312, 2005 WL 1300778, *1 (N.D.Ill. 2005)(Moran, J.); *Semien v. Life Insurance Co. of North America*, No. 03 C 4795, 2004 WL 1151608, *1 (N.D.Ill. 2004)(Kocoras, J.); 8 C.Wright & A. Miller, Federal Practice and Procedure § 2035, p. 265 (1970); 9A C. Wright & A. Miller, Federal Practice and Procedure: Civil 3d §2463.1 at 507 (2008).

It is simply a factually unsupported, tendentious prognostication of what she says she believes will occur if there is even the *possibility* that she will be required to turn over any information, in any case, whether to private litigants or the government. It is not a statement of burden, but the articulation of the rationale courts have used to fashion a reporter's privilege, *see e.g. Gonzales* v. *NBC, Inc.*, 194 F. 3d 29, 35 (2d Cir. 1999)–a rationale that the Supreme Court and the Seventh Circuit have rejected.

In *Branzburg*, the Court stressed that the "the evidence fails to demonstrate that there would be a significant constriction of the flow of news to the public if this Court reaffirms the prior common-law and constitutional rule regarding the testimonial obligations of newsmen." 408 U.S. at 693-94. *McKevitt* put it this way: "The cases that extend the [reporter's] privilege to

nonconfidential sources express concern with harassment, burden, using the press as an investigative arm of government, and so forth . . . Since these considerations were rejected by *Branzburg* even in the context of a confidential source, these courts may be skating on thin ice. " 339 F.3d at 533. *See also Herbert*, 441 U.S. at 171. And in *University of Pennsylvania,* in the context of confidential sources, the Court unanimously held:

> "The case we decide today in many respects is similar to *Branzburg v. Hayes*. . . . Petitioners there, like petitioner here, claimed that requiring disclosure of information collected in confidence would inhibit the free flow of information in contravention of First Amendment principles. In the course of rejecting the First Amendment argument, this Court noted that 'the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability.'... We also indicated a reluctance to recognize a constitutional privilege where it was 'unclear how often and to what extent informers are actually deterred from furnishing information when newsmen are forced to testify before a grand jury.'... We were unwilling then, as we are today, 'to embark the judiciary on a long and difficult journey to ... an uncertain destination.'" 493 U.S. 201.

*Compare Crawford v. Marion County Election Board*, _U.S._ 128 S.Ct. 1610, 1622-23 (2008) (absent evidence of the number of voters impacted by Indiana's law, the Court could not conclude that the statute imposes excessively burdensome requirements on any class of voters).

If the kind of conclusory, predictive statements in Ms. Millett's affidavit sufficed to show burden here – and as the movant, the burden is the Respondents'-- they would suffice in all cases, and the very reporter's privilege *McKevitt* rejected would be reincarnated under the rubric of "burden" and with less flexibility than its progenitor. The subtle evasion that would result from acceptance of the Respondents' theory was addressed in the related context presented in *Northwestern Memorial Hospital.* Here is how the court put it: "But instead, the [district] court resurrects the privacy question through the 'undue burden' language of [Rule] 45(c)(3)(A)(iv). . . .

This conclusion is wrong on several levels. . . . The only burden identified by the district court seems to be a 'potential psychological cost.' Even assuming that is the kind of 'burden' Rule 45 contemplates, reliance on that as a burden in effect creates a privilege where none exists." 362 F.3d at 935, 939

Finally, Ms. Millett's prediction is contrary to long "[e]xperience... [which can] correct uncertain prophecy." *Sinclair Refining Co. v. Jenkins Petroleum Processing Co.*, 289 U.S. 689, 698 (1933). *See also* Cardozo, Paradoxes of Legal Science (1928)("Often a liberal antidote of experience supplies a sovereign cure for a paralyzing abstraction built upon a theory."). As the court said in *Branzburg,* 408 U.S. at 699-700: "From the beginning of our country the press has operated without constitutional protection for press informants, and the press has flourished. The existing constitutional rules have not been a serious obstacle to either the development or retention of confidential news sources by the press."

The importance of and need for the information sought by the defendants in the instant case are in inverse proportion to the burden imposed on the Respondents if they are required to produce audio and video tapes of the Mosely interviews. Indeed, the stakes for the individual defendants could scarcely be greater. Not only is there the prospect of a crippling damage award, but their reputations will be ruined – justifiably so if they did what the complaint alleges. These are factors to be weighed in the balance along with the myriad factors to be considered in deciding whether the subpoenas are "reasonable in the circumstances." [12]

---

[12] The interest in preserving reputation is, as the Supreme Court has recognized, of enormous significance. *See Meese v. Keene,* 481 U.S. 465, 473 (1987); *Welch v. Helvering,* 290 U.S. 111, 115-16 (1933) (Cardozo, J.); *McBryde v. Committee to Review Circuit Council Conduct and Disability Orders of the Judicial* (continued...)

The information sought is both necessary to the defendants and unavailable from anyone but the Respondents. Asking Mr. Mosely at a deposition what he told Ms. Millett is not an adequate substitute for the audio or video tapes of his conversations with Ms. Millett. Unlike the prosecutors and the defense lawyers, Mr. Mosely is not a member of the bar, and, as a party to the case, has an obvious and undeniable motive to color his testimony – just as do the defendants. The interviews took place years ago and memory is selective as well as fallible. *Kadia v. Gonzales*, 501 F.3d 817, 822 (7th Cir. 2007). Audio and video tapes are not. *See Lopez v. United States*, 373 U.S. 427, 439 (1963). Also, his demeanor in answering questions may be relevant, *see United States v. Hale*, 2004 WL 1123796 (N.D.Ind. 2004), and that can only be observed by viewing an audiotape if one exists.

But, say the Respondents, *Patterson v. Burge*, 2005 WL 43240 (N.D.Ill. 2004) precludes enforcement of a subpoena seeking production of tape recordings of journalists' interviews. There the district court quashed subpoenas directed to the Chicago Tribune Company, WGN Continental Broadcasting Company and WMAQ-TV, seeking all videotape and audiotape footage reflecting statements made by Aaron Patterson in interviews with a number of journalists. It did so because the justifications advanced for the subpoenas were "meager, to say the least," and there was no showing that the subpoenaed records were likely to contain the information sought. Quite the contrary. *Patterson* had made numerous (apparently consistent) public statements to many

---

[12](...continued)
*Conference of the United States*, 264 F.3d 52, 57 (D.C. Cir. 2001). It is that reputation which in part shapes one's very existence. "Am I not what I am, to some degree in virtue of what others think and feel me to be?" I. Berlin, Four Essays On Liberty, 155 (1969). Indeed, experience has taught that the dignity accorded an individual may depend as much on reputation as on actual merit. *See,* Posner, Cardozo: A Study In Reputation (1993).

journalists, and it was unlikely that the subpoenaed materials would contain statements that varied from his public declarations. *Id.* at * 3.

*Patterson* expressed concern that given the insatiability of all too many civil litigants to engage in endless discovery – what the Seventh Circuit has called "the bane of modern litigation," *Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 542 (7th Cir. 2000) – indiscriminate enforcement of subpoenas to news organizations based solely on a finding of "mere relevance," could have an undue burden on journalists and the media. *Id.* That concern could not be more valid. *Cf. Northwestern Memorial Hospital* (relevance alone is not enough to enforce a subpoena to a non-party).

But that risk is not present in this case. Unlike *Patterson* and *Northwestern Memorial Hospital,* the subpoenaed records have substantial, identifiable "probative value;" there are not consistent, repeated public statements by Mr. Mosely making the likelihood of an inconsistent statement improbable; and disclosure would not impose any burden on the Respondents – at least none that the Respondents have properly shown. In short, the "good justification," *id.* at *3, that *Patterson* held must be shown before a subpoena to a journalist–or to any non-party–can be enforced exists in abundance here.

Of course a journalist's notes or tapes (or other manifestations of journalistic endeavors) should not be "available on request." *Id.* And they are not. *Cf. Herbert,* 441 U.S. at 174 ("There is no law that subjects the editorial process to private or official examination merely to satisfy curiosity or to serve some general end such as the public interest; and if there were, it would not survive constitutional scrutiny as the First Amendment is presently construed."). And just as there should not be "judicial insensitivity" to a journalist's endeavors to protect the confidentiality of the

information they receive, *id.* at *3, there cannot be some heightened judicial sensitivity merely because audio tapes of a journalist's interview are at issue, for that would, in effect, require the application of the "special criteria" to subpoenas to the press that *McKevitt* proscribed.

In refusing to compel production of the audiotapes at issue in the case, *Patterson* adverted to *Hobley v. Burge's* observation that Rule 45(c) permits the court to protect against the disclosure of "trade secrets and other confidential commercial information," and "'[t]here is nothing in the Federal Rules that suggests that research for the purpose of news reporting [not to speak of editorial judgments about what should and should not be published] is to be given *less* protection than research for the purpose of product development.'" *Id.*\* 3 (Emphasis and brackets in original).

However, characterizing an audiotape of a journalist's interview as "research for the purpose of news reporting" and then equating it with a trade secret and other confidential commercial information protectable from disclosure under Rule 45 is somewhat inexact – and ultimately unnecessary. An audiotape is essentially a recording of what someone said. That it is also used in an article or story does not change that essential fact. The information is gathered for ultimate public dissemination, and thus is different than the kind of confidential information itemized in Rule 45, which is intended to be kept from public disclosure.

But even trade secret and other confidential commercial information is not immune from discovery and may be ordered produced when necessary pursuant to appropriate protective orders – as *Patterson* itself recognized. 2005 WL 43240 at *3 ("good justification" should exist before an audiotape reflecting "editorial judgments" of what to ask and what to use should be produced). In short, the analysis of reasonableness mandated by *McKevitt* and Rule 45(c) would not seem to be aided by calling audiotapes of interviews for use in a magazine article confidential information or

26

"research for the purpose of news reporting." *Cf. DeSanto v. Pennsylvania*, 273 U.S. 34, 43 (1927)(Brandeis, J.)("The logic of words should yield to the logic of realities."); *Worthen Co. v. Kavanaugh*, 295 U.S. 56, 62 (1935)("Our concern is with realities not nomenclature.").[13]

Tape recordings may well reveal something of the journalist's methods of investigation and editorial decisions about what should be included, but so too did Ms. Millett's article, itself, and so too did the tape recordings in *McKevitt*. Nonetheless, Judge Posner concluded that the district court's grant of the order to produce the tape recordings for use at trial "was clearly sound...." 339 F.3d at 535. But the revelation of methods of investigation differ from revelation about trade secret and commercial information since lawyers are not competing with journalists and a reporter's method of investigation and his or her choices about what should be published and what withheld will vary from assignment to assignment. In that way, the disclosure involved in production of a taped interview is significantly different from disclosure of an attorney's work-product or a researcher's efforts which would provide the opposing lawyer or a competitor with a significant advantage.

But even if it were to be acknowledged that disclosure of a tape recording is a disclosure of methods and thought processes of the journalist, it would still not end the inquiry. It would simply be a factor to be weighed in the balance with the other Rule 45 factors. In *McKevitt*, the journalist argued that he would be commercially disadvantaged if his work-product was disclosed. The court

---

[13] Moreover, calling an audiotape of an interview the journalist's "work product," 2005 WL 43240 at *3, seems to create a journalist's "work-product" privilege. But that is the journalist's privilege in another form and with another name, but with the same justifications and sustaining rationale that *McKevitt* and *Branzburg* have rejected as a basis for a journalist's privilege. It would be anomalous to concede on the one hand that the broader journalist's privilege does not exist while simultaneously concluding on the other that there is a journalist's work-product privilege.

concluded the argument was unsupported and in any event, would be implausible, although he noted that if such a showing had been made, it would be a factor that a district court might consider in deciding on a challenge to a subpoena. 339 F.3d at 535.

Properly read, *Patterson* does not create some special or heightened burden for subpoenas to journalists seeking audio tapes of interviews, nor did it announce a *per se* rule of exclusion, nor could it given *McKevitt*'s directive to district courts not to treat journalists specially, but merely to insure that subpoenas directed to them are "reasonable in the circumstances." In the end, the district court clearly engaged in the balancing process required by Rule 45. *See* 2005 WL 43240 at *5.

### 3.
### The Notes Of Mr. Mosely's Interviews

*Hobley v. Burge* made a distinction between a subpoena for audiotapes and one for a journalist's interview notes "with or about *Hobley*," 223 F.R.D. at 505, in part, on the theory that requiring production of notes would result in an increased burden on the reporter because he would "almost certainly" be required to testify to explain the notes. *Id.* Under the circumstances presented, the district court quashed a subpoena calling for the journalist's notes. As in *Patterson,* but unlike here, there was an insufficient showing of need and of the likelihood that the subpoenaed materials would contain information that might reasonably lead to the discovery of admissible evidence.

To the extent that the subpoena called for notes that related to *Hobley* – as opposed to notes of the interviews, themselves – the subpoenas were plainly overbroad and could fairly be characterized as seeking the confidential work product of the journalist (which was irrelevant). 223

F.R.D. at 505.[14] That kind of information, the court held, should be given no less protection than research for the purpose of product development. *Id.* It does not follow, however, that notes of interviews "with Hobley" stand on the same footing. Phrased differently, depending upon the facts of the case, a subpoena for notes containing information relating to someone may be "unreasonable," while a subpoena for notes of an actual interview may be perfectly reasonable. *See McGahey v. Commonwealth of Virginia*, 135 U.S. 662, 707 (1890)("what would be reasonable in one class of cases would be entirely unreasonable in another.").

Notes of interviews that essentially record what a person said (whether or not the questions are also reflected) are not the same, either legally or factually, as a journalist's notes that record his or her own mental impressions, research endeavors, strategies, or anything else that may fairly be called work-product. Calling the former "research for the purpose of news reporting," 223 F.R.D. at 505, does not change that reality. Law does not turn on labels. *Walsh v. Heilmann*, 472 F.3d 504 (7th Cir. 2006). *Cf. King v. Federal Bureau of Prisons*, 415 F.3d 634, 636-637 (7th Cir. 2005)(calling something a business doesn't make it a business); *In re TCI Ltd.*, 769 F.2d 441 (7th Cir. 1985) (calling a building personality doesn't make it so).

Of course, "interview notes" may contain a journalist's thoughts and impressions and other information that typically may be thought of as "work-product" in addition to the memorialization of what the interviewee said. In the instant case, it is impossible to know what Ms. Millett's notes and summaries of conversations consist of, because the Respondents have not filed a privilege log

---

[14] The subpoenas in the instant case do not suffer from that overbreadth and are limited to audio or video recordings made of conversations with Mr. Mosely and any notes and/or summaries of conversations with Mr. Mosely made in connection with the article.

and have made no attempt to argue that the notes contain Ms. Millett's work-product in addition to Mr. Mosely's statements to her. They have not sought to redact the notes and to ask that the redactions be viewed *in camera*. Thus, they have waived any argument that the notes of interviews or summaries of interviews contain information to which the defendants are not entitled.

In considering the burden versus benefit analysis, *Hobley* noted the important role that news gathering plays in a free society which requires courts to be vigilant against attempts by civil litigants to turn non-party journalists into their "'private discovery agents.'" *Hobley* found support for this proposition in the Second Circuit's decision in *Gonzales v. NBC*, 194 F.3d 29, 35 (2nd Cir. 1999), which predicted the impairment of the press' ability to perform its important functions if civil litigants were free to "sift through the press files in search of information supporting their claims." 223 F.R.D. at 505. *Gonzales* was one of the cases that *McKevitt* held "may be skating on thin ice," 339 F.3d at 533, and whose concern with harassment, burden, using the press as an investigative arm of government and so forth, *id.*, was rejected by the Supreme Court in *Branzburg*. Preoccupation with the kinds of speculative harm on which *Gonzales* rested tends to divert attention from the central inquiry, which is reasonableness *"in the circumstances." McKevitt* (Emphasis supplied).

Journalists are not exempt from the principle that the public has a right to everyman's evidence, unless protected by a constitutional, common-law, or statutory privilege. *Branzburg*, 408 U.S. at 688; *United States v. Bryan*, 339 U.S. 323, 331 (1950). Even evidentiary privileges rooted in the Constitution must give way in proper circumstances, for these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth. *Herbert*, 441 U.S. at 175. *See also United States v. Hale*, 2004 WL 1123796 (N.D.Ind. 2004)("The mere fact that Flock is a reporter does not automatically render the subpoena

unreasonable."); *United States v. Jennings*, 1999 WL 438984 (N.D.Ill.1999)(reporter ordered to submit to deposition for the limited purpose of determining whether an interview affected a witness's testimony and to produce his interview notes). The duty is not confined to criminal cases, *Jones v. Clinton*, 72 F.3d 1354, 1365 (8th Cir. 1996); *In re Horowitz*, 482 F.2d 72, 81 (2d Cir 1973)(Friendly, J.), and includes the production of information by journalists. *McKevitt*.

But those required to give testimony "may fairly demand that society, so far as the exaction of it is concerned, shall *make the duty as little onerous as possible.*" 8 Wigmore, Evidence §§ 2192-2193 (McNaughton rev. ed.1961)(Emphasis in original). The "burden" imposed on a journalist to testify can be mitigated by imposition of time constraints, requiring that the deposition proceed at a certain place and time, and limiting the deposition only to those topics necessary to the case and, the burden imposed by enforced production of documents can be mitigated by ensuring that the subpoena is not overbroad and that the journalist is required to produce no more than is needed. .

In the end, *Hobley* concluded that "the individual defendants have not shown a substantial need for Conroy's notes." Without that showing, the scales tip in favor of the journalist, not because he is a journalist, but because non-parties are entitled to special protection under Rule 45, *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir.1998), and no non-party should be required to produce evidence or be deposed needlessly. *See Herbert*, 441 U.S. at 177. Properly read, *Patterson* and *Hobley* hold that when there is not a substantial showing of need and likelihood that the information subpoenaed will not reasonably be thought to lead to admissible evidence, a subpoena directed to a journalist is not reasonable. To read those cases as drawing a conjurer's circle around a journalist's interview notes or tapes of interview is to misread them.

31

The Motion to Compel Ms. Millett's notes of interviews of or conversations with Mr. Mosely is granted.

**4.**

### Ms. Millett's Deposition

Finally, there is the question of whether Ms. Millett should be deposed "after the close of discovery," as the defendants have requested. (Reply at 6). Much may occur between then and now that will make any testimony by her unnecessary, and questionable discovery ought not be allowed where the events that will influence the decision on whether discovery ought to proceed are uncertain and contingent and may not occur as anticipated, or at all. *Compare Lincoln House Inc. v. Dupre*, 903 F.2d 845 (1st Cir.1990). The motion to depose Ms. Millett at the end of discovery is denied without prejudice.

### CONCLUSION

Parties to civil litigation have no right to subpoena journalists or news organizations merely to satisfy curiosity or in the hope — however improbable — that something might turn up. That prohibition, however, is not limited to journalists, but applies to all non-party subpoenas, which must pass the test of reasonableness. Journalists and news organizations do not enjoy a preferred position under Rule 45, and the criteria applicable to all other non-parties apply equally to them.

The defendants have sufficiently shown that the notes and tapes of Ms. Millett's interviews of and conversations with Mr. Mosely made in connection with the article are relevant and that they are sufficiently likely to contain admissible evidence and/or information reasonably calculated to lead to the discovery of admissible evidence. The Respondents have failed to show any burden that

would result from production of those tapes or the notes. Accordingly, the Motion to Compel is granted as to these categories.

However, the defendants have failed to show that the notes or tapes of the lawyers in the case or anyone else quoted in the article (other than Mr. Mosely) are likely to contain relevant evidence or that they have any need for them. Any information can be obtained directly from these individuals either by interview or deposition. Thus, as to the notes or tapes of these individuals, the subpoena is unreasonable and imposes an undue burden on Ms. Millett and Chicago Magazine. The Motion to Compel is therefore denied insofar as it seeks production of "any audio or video recordings made of any known, identified source in the article; any notes and/or summaries of conversations with prosecutors Andrew Varga, Ethan Holland, James Lynch made in connection with the article; and any notes and/or summaries of conversations with defense attorneys, Edwin Korb, James Fryman, Catherine O'Daniel, Laura Caldwell, made in connection with the article.

The Respondents may file within 14 days separate, supplemental affidavits making clear whether the tapes exist, and if they do not, explaining the circumstances surrounding their loss or destruction. The defendants' Motion to Depose Ms. Millett at the close of discovery is denied without prejudice.

ENTERED:_____
UNITED STATES MAGISTRATE JUDGE

DATE: 8/11/08