IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOVAN MOSLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 06 C 6314 |
| v. | ) |
| | ) |
| CITY OF CHICAGO, CLARENCE HILL, | ) HONORABLE DAVID H. COAR |
| MAVERICK PORTER, DERAIL EASTER, | ) |
| CHARLES WILLIAMS, EDWARD | ) |
| HOWARD, JR., Officers of the Chicago | ) |
| Police Department, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Jovan Mosley was arrested and tried for the murder of Howard Thomas. After five years and eight months in the maximum-security wing of Cook County Jail, Mosley was acquitted. He filed this lawsuit under 42 U.S.C. § 1983, arguing, among other things, that the police violated his due-process rights by removing and destroying a lineup report recounting an exculpatory statement by the lineup witness, and by concealing evidence that an onlooker who had identified Mosley as a participant in the attack on Thomas had been intoxicated at the time. The police officer defendants and the City have filed a motion for summary judgment on his § 1983 claims and his claims under Illinois law. For the reasons stated below, the court grants the motion for summary judgment.

# I. FACTS[1]

On August 6, 1999, at approximately 12:45 a.m., Officer Lionel Dunem responded to a battery in progress at 7330 South Calumet Avenue in Chicago, Illinois. Upon arrival, Officer Dunem observed a man (later identified as Howard Thomas) lying motionless in a pool of blood in the parkway outside that address. (R.80, Facts ¶5.) Based on the subsequent August 1999 investigation, the police concluded that Thomas had been beaten to death by a group of three to five black men in their late teens to mid-20s. The investigation led to the arrest and prosecution of the following persons: Frad Muhammad a/k/a Big Muhammad; Lawrence Wideman a/k/a Red; Marvin Treadwell a/k/a Leno and Marlon; and Jovan Mosley a/k/a Jason, Jovizzle, "My Guy," and "Frad's friend." (*Id.* ¶3.)

Eyewitnesses gave partial physical descriptions of three of the offenders who had beaten Thomas with a baseball bat. (*Id.* ¶6.) Among the witnesses were Jori Garth and Anton Williams, both teenagers, who had been sitting on the porch of Garth's mother's house at 7324 South Calumet and had seen the attack. (*Id.* ¶8.) More than six months after the attack, Detectives Clarence Hill and Charles Williams interviewed Garth and Williams. (*Id.* ¶7.) Detectives Hill and Williams, along with Edward Howard, Jr., Maverick Porter[2], and Derail Easter, were working in the Area 2 violent crimes unit in February and March 2000; they were homicide detectives in the Chicago police department at the time. (*Id.* ¶2.)

### *Statements and Testimony of Jori Garth and Anton Williams*

In Garth's February 16, 2000 interview, she said that while she and Anton sat on the

---

[1] Plaintiff's Response To Defendant's Local Rule 56.1(a)(3) Statement of Undisputed Facts [R. 98] largely fails to comply with Local Rule 56(b)(3)(C). Most of Mosley's replies do not controvert the specific facts proffered by Defendants; instead, they offer additional, nonresponsive factual allegations, many of which are belied by the record. Where that is the case, the court will treat Defendants' proffered facts as admitted and ignore Mosley's replies, except where an evidentiary basis for Mosley's nonresponsive assertions is readily apparent from the record.

[2] Detective Porter passed away on September 3, 2009.

porch a group of between five and seven men arrived. She recognized one of the men as "Fetta" (Gregory Reed) who came up to the porch and spoke with Garth and Williams. According to Garth, the rest of the group stayed at the foot of the stairs, including a man she recognized as "Marlon" and a light-skinned, tall black man. (*Id.* ¶9; R. 98, Resp. to Facts ¶9.) Garth told the detectives that while Reed was on the porch, Thomas walked by on the street. Someone said, "there go that motherf---er right there," and members of the group ran toward him and began to attack him. A light-skinned, tall, black man had a baseball bat; he struck Thomas several times on the head. (R. 80, Facts ¶10; R. 98, Resp. to Facts ¶10.) Garth testified by deposition in 2008 that she told the police at some point (it's unclear when) that the man with the bat, along with two black men with braided hair, were the only members of the group who had attacked Thomas. (R. 98, Resp. to Facts ¶10; Pl.'s Ex. 3 at 30:17-24.)

In Williams's February 16, 2000 interview, he said five men had come to the porch, and that he recognized three of them as Reed, Marlon, and "Big Muhammad." He said he did not recognize the other two. (R. 80, Facts ¶11.) Williams said that when Thomas walked by, members of the group rushed toward Thomas and began attacking him. (*Id.* ¶12.) Detective Williams testified by deposition, and Detectives Hill and Howard testified by affidavit, that Anton Williams had said that everyone in the group except Fetta had attacked Thomas. (R. 80, Ex. 2 ¶¶17-18; Ex. 3 ¶¶17-25.)

According to Anton Williams's deposition testimony, during the interview he told the detectives that five men, including Mosley, were beating Thomas during the attack. (R. 80, Ex. 15 at 17:20-19:22, 38:22-40:11.) Williams testified that he consistently told detectives that Mosley was part of the group that attacked Thomas, although he could not say exactly what he saw Mosley do. (*Id.* at 40:22-41:14.) Although he testified that it was possible that he told the

3

detectives that Mosley did not do anything during the attack, he was certain that he did not tell the detectives that Mosley had not participated in any way in the murder; nor did he remember saying that Mosley had not participated in the attack. (*Id.*; *Id.* at 43:9-17.) And at his grand-jury appearance and at Mosley's criminal trial, Williams repeatedly testified that Mosley was present at the attack but that Williams did not see Mosley attack Thomas. At his grand-jury testimony, he said that "he didn't see [Mosley] beat [Thomas], but [Mosley] was around the area." (R. 98, Pl.'s Ex. 4 at 9.) At Mosley's trial, he said, "I don't remember [Mosley] really hitting [Thomas] or nothing" (R. 98, Pl.'s Ex.3 at 43) and "I don't remember [Mosley] doing something." (*Id.* at 81.) However, when Mosley's defense attorney asked him a leading question about his identification of Mosley at a police lineup—"That's the person you identified as having been out there but not having done anything, correct?"—Williams answered, "Correct." (*Id.*)

Both Garth and Anton Williams said that Fetta ran toward Thomas but came back to the porch, complaining of having been struck by a baseball bat. (R. 80, Facts ¶14.)

### *Statements of Gregory Reed (a/k/a Fetta)*

Detectives and Assistant State's Attorney Victoria Ciszek interviewed Reed on February 18 and 20, 2000. Reed implicated "Red," "Marvin," Muhammad, and "Jason" in the attack. Reed said Jason had hit Thomas a couple of times. (R. 80, Facts ¶16.) Reed testified by deposition in 2008 that he had been "drunk as hell" on the night of the attack and could not recall exactly what had happened. (R. 98, Pl.'s Ex. 7 at 12:16-20.) And he testified that he told the police that he had been drunk on the night of the attack on Thomas. (*Id.* at 25:2-9, 27:1-6, 29:8-19, 35:1-24.) But Reed testified that the detectives did not tell him what to say or threaten him. (*Id.* at 28:4-12, 36:5-12, 46:5-7.) According to Reed, he told the detectives what he had heard had happened from other people (including Farad, Red, Marvin Treadwell, Anton Williams, and

4

Garth).  (*Id.* at 29:10-11, 33:17-34:23; 46: 8-15, 47:2-19.)  And he told them that his statements were not independent recollections of the events.  (*Id.* at 45:6-11.)  He also testified that the detectives told him a version of events before he wrote down his own statement.  (*Id.* at 33:17-34:16.)  Specifically, he said that Treadwell had told him that Mosley had been there, and that he had assumed that Mosley had thrown a punch or a kick.  (*Id.* at 47:23-48:12.)  And he testified that Red had said that Mosley hit Thomas, and that Anton had said that Mosley threw a punch.  (*Id.* at 49:2-50:10.)  Reed testified in his deposition that his written statement contains no mention of the fact that he was too drunk on the night to recall what had happened later, nor that what he was writing he had learned from other people.  (*Id.* at 46:22-51:2.)  Reed told the detectives that Red, Marvin, Muhammad, and "Jason" (whom he later identified as Mosley) were involved, and that Jason had hit Thomas a couple of times.  (R. 80, Facts ¶16.)

On February 19, 2000, Reed wrote out a detailed account of the attack, identifying "Jason" as the attacker who delivered the "third, fourth, and fifth blows" against Thomas.  (*Id.* ¶17.)  Reed was not intoxicated when he was interviewed, nor when he implicated "Jason" in his statement. (*Id.* ¶18.)

In late October or early November 2005, as Mosley's criminal trial approached, Reed told Assistant State's Attorney Andrew Varga that he had been drinking the night of the Thomas murder, that his written statement had not been based on personal knowledge, and that he could not testify at trial on the basis of personal knowledge.  (R. 80, Ex. 12 ¶¶24-26.)  ASA Varga did not call Reed to testify at Mosley's trial.  (*Id.*)  The record does not indicate whether or not ASA Varga disclosed this information to Mosley's defense attorney before trial.

### The Arrests and Prosecutions

Detectives Easter and Williams arrested Frad Muhammad on February 17, 2000. (R. 80,

5

Facts ¶15.) On February 20, 2000, in an interview with the detectives, Frad Muhammad implicated Jovan Mosley as a participant in the robbery and beating of Thomas. (*Id.* ¶21.) In his handwritten statement to ASA Ciszek, Muhammad said Mosley was part of the group but did not say what, specifically, Mosley did during the beating. (R. 98, Pl.'s Ex. 8.)

Lawrence Wideman, a/k/a Red, was arrested on February 19, 2000. (R.80, Facts ¶20.) The next day, in his statement to ASA Ciszek, Wideman said that Mosley had been present during the group's discussions about robbing someone and beating someone up prior to the attack on Thomas, that Mosley was present at the scene of the beating of Thomas, and that he left the scene with the group after the attack and drank a bottle of pop that had been taken from Thomas. (*Id.* ¶22; Ex. 10 ¶38; Ex. 10b at 5.)

On March 5, 2000, Marvin Treadwell was arrested. (R.80, Facts ¶23.) In interviews with detectives and in a videotaped statement given to Assistant State's Attorney Jeffrey Levine, Treadwell implicated an individual he referred to as "My Guy" and "Frad's friend" as the fifth member of the group involved in the attack on Thomas. Treadwell said that "My Guy," a/k/a "Frad's friend" was one of the men who had hit Thomas. (R.80, Facts ¶24; Ex. 4, ¶¶15-25.)

Mosley was arrested at approximately 4:00 p.m on March 6, 2000. (R. 80, Facts ¶24.) At approximately 11:30 p.m. that same day, Mosley was viewed in a lineup by Garth and Williams, with Detective Hill present. (*Id.* ¶25). Garth did not identify anyone; Williams positively identified Mosley. (*Id.*; Ex. 20 ¶¶3-7; Ex. 20a.) At approximately midnight, Detective Hill brought Mosley to the lockup, and this was the last contact, other than in-court appearances, that Mosley had with any of the Defendant Detectives. (R. 80, Facts ¶72.)

On June 19, 2001, Detective Hill prepared a Case Supplementary Report ("the Report") documenting the results of the March 6, 2000 lineup, after discovering that one had not been

prepared contemporaneously to the lineup. (*Id.* ¶¶31, 36; Ex. 3 ¶¶61-64; Ex. 3c.) No other lineup report was prepared by any of the Defendant Detectives. (R. 80, Facts ¶36; Ex. 3 ¶64.) The Report states, "The investigation into the beating, robbery and murder of Thomas [,] Howard revealed that Jovan Mosley participated in that incident." (R. 98, Pl.'s Ex. 3c.) It did not say precisely what Williams identified Mosley as having done. (R. 98, Resp. to Facts, ¶31.) At his deposition, however, Williams agreed that this was a "fair characterization of the results of the lineup." (R. 80, Ex. 15 at 42:3-13.)

By agreement of the parties, Mosley's criminal case was continued from April 2000 to November 2005, while Mosley remained in the maximum-security wing of Cook County Jail. (R. 80, Facts ¶49; Ex. 23 at 23:6-24:10, 39:14-42:9; Ex. 24 at 39:13-43:8.) The Report and Williams' grand-jury testimony were both disclosed to Mosley's defense attorney before trial. (R.80, Facts ¶¶39,52; Ex. 21 at 61:1-9, 61:17-62:5.) His attorney was not prevented from interviewing Williams before trial. (*Id.*) In November 2005, Mosley was acquitted by a jury. (R. 80, Facts ¶57.) Wideman, Treadwell, and Frad Muhammad were all convicted of first-degree murder. (*Id.*)

## II. SUMMARY JUDGMENT STANDARD

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

The nonmoving party, in turn, may not rest on the allegations in his pleadings or conclusory statements in affidavits; he must support his contentions with evidence that would be admissible at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c). To avoid summary judgment, the nonmovant must do more than raise a "metaphysical doubt" as to the material facts. *See Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted). And "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

### III. ANALYSIS

*Count I: Due-Process Violation*

Mosley claims that his due-process rights were violated when Defendant Detectives (1) deliberately suppressed Williams's exculpatory statement at the March 6, 2000 lineup by withholding a lineup report in which it was recounted; (2) withheld evidence that Reed's statement was not made on the basis of personal knowledge, since he had been drunk at the time of the attack on Thomas. Defendants contend that Mosley's acquittal precludes the necessary showing of prejudice under *Brady v. Maryland*, 373 U.S. 83 (1963), and that, in any event, no material exculpatory evidence was ever suppressed. They assert, alternatively, an affirmative defense of qualified immunity.

"A *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused." *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006). Exculpatory and impeachment evidence are both "favorable to the accused." *Id.* at 870. A *Brady* violation may occur when the suppressed evidence is known only to police investigators and not to the

8

prosecutor. *Id.*; *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008). Favorable evidence is material if its suppression resulted in prejudice, that is, "a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (internal citations omitted). A "reasonable probability" exists where "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

Unlike the typical *Brady* plaintiff, however, Mosley was acquitted at trial; thus, the alleged suppression of Williams's statement cannot undermine confidence in Mosley's trial verdict. Defendants would end the inquiry at that. Seizing on the word 'verdict,' Defendants urge a bright-line rule on which an acquitted defendant fails, as a matter of law, to establish prejudice: no amount of withheld evidence, they argue, could possibly have produced a verdict more favorable than an acquittal. And since *Brady* protects a criminal defendant's right to a reliable trial verdict, Defendants reason that postconviction incarceration is the only liberty deprivation that can result from denial of the process that is due under *Brady*.

In recent dicta, the Seventh Circuit has "expressed doubt . . . 'that an acquitted defendant can ever establish the requisite prejudice for a *Brady* violation.'" *See Bielanski v. County of Kane*, 550 F.3d 632, 644 (2008) (quoting *Carvajal*, 542 F.3d at 570). But it has not foreclosed these claims entirely; their status remains an open and murky question in this circuit. In both *Bielanski* and *Carvajal*, the Seventh Circuit acknowledged the possibility, without explicitly holding, that the plaintiffs—both of whom had been acquitted at their criminal trials—could show prejudice by "establish[ing] a 'reasonable probability' that the decision to go to trial would have been altered by the desired disclosure." *Id.* at 568; *see also Bielanski*, 550 F.3d at 644-45. Thus, Mosley could prevail if (unlike Bielanski or Carvajal) he could show that the police

9

suppressed "the type of evidence that would have precluded the charges entirely." *Id.* at 645. If "the withheld information would have destroyed the prosecution's case," *see id.* at 642, leading to dismissal of the charges before trial, Mosley's five-plus years in pretrial detention would be cognizable as damages resulting from a *Brady* violation. Showing all of this is a tall order, to be sure, but Mosley's *Brady* claim is not foreclosed as a matter of law.

Thus, to survive Defendants' motion for summary judgment, Mosley must demonstrate a genuine issue of material fact as to whether the police suppressed exculpatory or impeachment evidence that, if revealed, would have resulted in dismissal of his charges before trial. This he has failed to do.

*First*, Mosley contends that the police suppressed exculpatory evidence by destroying or otherwise withholding a report from the lineup at which Anton Williams identified Mosley— according to Mosley, as someone who was present at but did not participate in the attack. But Mosley has not produced any evidence at all from which a reasonable jury could infer that this lineup report ever existed. The record only contains evidence of the Report of June 19, 2001, which Detective Hill created after he learned that no contemporaneous report had been filed. (R. 80, Facts ¶¶31, 36; Ex. 3 ¶¶61-64; Ex. 3c.) It is undisputed that neither Detective Hill nor any other Defendant Detective prepared any other lineup report. (R. 80, Facts ¶36; Ex. 3 ¶64.) The Report was provided to Mosley's defense attorney before trial, and she is not aware of any other lineup report. (R. 80, Facts ¶39; Ex. 21 at 62:1-5, 94:1-19.)

The Report stated that "Investigation into the beating, robbery and murder of Thomas [,] Howard revealed that Jovan Mosley participated in that incident" (*id.*) and Williams agreed at his deposition that this was a "fair characterization of the results of the lineup." (R.80, Ex. 15 at 42:3-13.) He also testified that he never told the police that Mosley did not participate in the

attack (R.80, Ex. 15 at 43:9-17) and that he consistently told the detectives that Mosley was part of the group that attacked Thomas, although he could not say exactly what, if anything, he saw Mosely do. (*Id.* at 40:22-41:14.) Williams's deposition statements are consistent with his grand-jury testimony, in which he said that he "didn't see [Mosley] beat [Thomas], but [Mosley] was around the area," and that he couldn't see everything that was going on. (R. 98, Pl.'s Ex. 4 at 9.)

The only colorable evidence of the alleged exculpatory statement comes from Williams's testimony at Mosley's trial. Mosley contends that in the following colloquy, Williams testified that he explicitly told the detectives that Mosley was present for the attack but did not participate:

> Q. In fact, you told them that Jovan didn't do anything, correct?
> A. Yes, I remember. *I don't remember him doing something.*
> Q. That was something, of course, that you told the detectives, correct?
> A. Yes.
> Q. They asked you to view a lineup on March the 6th, correct?
> A. Yes.
> Q. And you were already shown the picture and you drew an X over Jovan, correct?
> A. Yes.
> Q. *That's the person you identified as having been out there but not having done anything, correct?*
> A. *Correct.*

(R. 98, Pl.'s Ex. 6 at 81, emphases added.) Earlier in his testimony, Williams said, "I don't remember [Mosley] really hitting [Thomas] or nothing." (*Id.* at 43.) In every instance but this colloquy, Williams unmistakably claimed that he didn't remember or *didn't see* Mosley participate in the attack, not that he *saw that Mosley didn't* participate in the attack. In this colloquy, Williams first says—consistent with the rest of his testimony, statements, and depositions—that he did not remember Mosley attacking Thomas. It was Mosley's defense counsel, framing a leading question on cross examination, who said that Williams "identified [Mosley] as having been out there but not having done anything." But counsel's characterization does not track any other statement from Williams available in the record.

11

On the basis of Williams's unelaborated answer to a leading question from Mosley's defense attorney, Mosley would ask a jury to infer that, contrary to the rest of his testimony, statements, and depositions, Williams affirmatively observed that Mosley *did not* participate in the attack; that he said so to Detective Hill at the lineup; and that Detective Hill destroyed or otherwise withheld the original lineup report, which recounted this exculpatory statement, notwithstanding that Mosley can produce no evidence that this report ever existed. Even construing the ambiguous colloquy in the light most favorable to Mosley, he has not produced more than a mere "scintilla of evidence" that exculpatory evidence was suppressed. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). Without that evidence, his claim cannot survive summary judgment, as his remaining allegations—that Detective Hill violated police procedures in completing the Report (R. 98, Resp. to Facts ¶39)—are unavailing. *See Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) (citing *Scott v. Edinburgh*, 346 F.3d 752, 760 (7th Cir. 2003)) (violation of police regulations not actionable under § 1983 and "immaterial" to question whether constitutional violation has been established).

Moreover, evidence that is "available to the defendant through the exercise of reasonable diligence" is not suppressed for *Brady* purposes. *Carvajal*, 542 F.3d at 567 (citing *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005)). Mosley's defense attorney could have readily discovered anything Williams might have said at the lineup by interviewing him. She had access to Williams's grand jury testimony, which she believed did not support the Report's assertion that Mosley was identified as having participated in the attack. (R. 80, Facts ¶¶52-53; R. 98, Pl.'s Ex. 21 at 61:7-9, 83:13-20.) Nobody prevented her from talking to Williams before the trial, although she chose not to. (R. 80, Facts ¶52; R. 98, Pl.'s Ex. 21 at 61:1-6.) Since reasonable diligence could have uncovered Williams's alleged statements, they were not suppressed.

*Second*, Mosley contends that the police failed to disclose that Reed was intoxicated during the attack on Thomas and had no independent recollection of the events. Reed testified by deposition that he was "drunk as hell" at the time (R. 98, Pl.'s Ex. 7 at 12:16-20) that he told the police as much (*id.* at 25:2-9, 27:1-6, 29:8-19, 35:1-24) and that his statements were derived from what he had heard about the events from other people, including the detectives themselves, rather than from his own independent recollections. (*Id.* at 29:10-11, 33:17-34:23, 45:6-11, 46:8-15, 47:2-19.) His written statement, which implicates Mosley in the attack, does not mention his intoxication or lack of independent recollection. (R. 80, Ex. 9a.)

This information about Reed speaks to the reliability of his written statement and is therefore impeachment evidence. But it is not "the type of evidence that would have precluded the charges entirely," had it been disclosed before trial. *See Bielanski*, 550 F.3d at 645. That is in part because it does not exculpate Mosley; it couldn't, if Reed was too drunk to remember what happened. At best, it would have undermined the account of events in Reed's written statement, but this was not the State's only evidence, and not the only basis for proceeding to trial. (Ex. 12 ¶¶25-27.) Indeed, Reed told the prosecutor that he had no personal knowledge of the events; the prosecutor proceeded to trial anyway and did not call Reed as a witness. (*Id*. ¶¶24-26.) Thus, the record cannot support a finding of a "reasonable probability" that disclosure of this information about Reed before trial would have resulted in a dismissal of the charges.

This case illustrates the difficulty faced by acquitted criminal defendants who seek to base *Brady* claims on the withholding of impeachment, rather than exculpatory, evidence. Impeachment evidence in general is far less likely to "destroy[] the prosecution's case before trial," *see Bielanski*, 550 F.3d at 642, and thus far less likely to establish prejudice against a *Brady* plaintiff whose criminal trial resulted in acquittal. In *Bielanski*, for example, the plaintiff's *Brady*

13

claim was based on the suppression of evidence "material to the validity and reliability of [the victim's] statement." *Id.* at 643. The Seventh Circuit found that this evidence was "impeaching rather than exculpatory," *id.* at 644, and that it "weakened parts of the prosecution's case but was not the type of evidence that would have precluded the charges entirely." *Id.*; *see also Carvajal*, 542 F.3d at 569 (impeachment evidence at issue would not have allowed plaintiff to avoid trial). As a general matter, suppression of impeachment evidence could only cause prejudice to an acquitted criminal defendant if loss of the unreliable witness would leave the prosecution without enough to sustain the charges. That will not typically be the case, and it was not the case here.

Mosley has not established a due-process violation; thus, the court need not consider Defendants' affirmative defense of qualified immunity. Defendants are entitled to summary judgment on Count I.

### *Count II: State-Law Malicious Prosecution*

In Counts II-IV, Mosley brings various tort claims under Illinois law. Substantial time and judicial resources have already been committed to discovery, and the disposition of Mosley's state-law claims is straightforward and raises no novel issues of state law. The court will therefore retain supplemental jurisdiction even though Mosley's federal claims have now all been dismissed. *See* 28 U.S.C. § 1367(c)(3); *Sellars v. City of Gary*, 453 F.3d 848, 852 (7th Cir. 2006).

In Count II, Mosley brings a malicious-prosecution claim under Illinois law, so he must prove five elements: (1) the institution or continuance of judicial proceedings by the defendant against the plaintiff; (2) a lack of probable cause for those proceedings; (3) malice in instituting the proceedings; (4) termination of the proceedings in the plaintiff's favor; (5) damages resulting to the plaintiff. *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996); *see also Logan v.*

*Caterpillar*, 246 F.3d 912, 921-22 (7th Cir. 2001). The absence of any one of these elements would be dispositive for Defendants. *See Swick*, 662 N.E.2d at 1242. The undisputed facts show that there was probable cause to prosecute Mosley.

In the context of a malicious-prosecution claim, Illinois courts have described probable cause as "a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *E.g.*, *Johnson v. Target Stores, Inc.*, 791 N.E.2d 1206, 1219-20 (Ill. App. Ct. 2003); *see also Woods v. City of Chicago*, 234 F.3d 979, 994 (7th Cir. 2000) (probable cause defined as "facts and circumstances sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense") (citations and quotations omitted). The rule of probable cause is a "practical, nontechnical conception" that "requires more than bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Id.* (citations omitted).

The results of the 7-month investigation into the Thomas murder yielded an "honest and sound suspicion" that Mosley was implicated in the crime. From the start of their investigation, the detectives knew that a group of three to five young black men were responsible for the attack, and they learned from Garth and Williams that Fetta, Marlin, and Frad Muhammad were among that group. (R. 80, Facts ¶¶9,11.) It is undisputed that Mosley arrived at the scene with these individuals and left the scene with them immediately after the murder. (*Id.* ¶22; Ex. 4a at 18-20; Ex. 10b at 4-5; R. 98, Resp. to Facts ¶22.)

During the February 16, 2000 interview, Williams told the detectives that five men beat Thomas during the attack, and that Mosley was one of them. (R. 80, Ex. 15 at 17:20-19:22, 38:22-40:11.) The detectives had no reason to believe that Williams was not a credible

15

eyewitness, and an identification or a report from a single, credible victim or eyewitness can provide the basis for probable cause. *See Woods*, 234 F.3d at 994; *Tangwall v. Stuckey*, 135 F.3d 510, 520 (7th Cir. 1998); *Gramenos v. Jewel Cos.*, 797 F.2d 432, 439 (7th Cir. 1986).

In his interviews with the detectives and ASA Ciszek, Reed implicated Mosley in the attack, claiming that Mosley had hit Thomas a couple of times—and he reiterated this claim in his written statement. (R. 80, Facts ¶¶16-17; Ex. 9a at 3.) In Illinois, either "personal knowledge" or "information from other persons" can provide "a reasonable ground for belief of the guilt of an accused." *Reynolds v. Menard, Inc.*, 850 N.E.2d 831, 838 (Ill. App. Ct. 2006) (citing and quoting *Turner v. City of Chicago*, 415 N.E.2d 481, 485 (Ill. App. Ct. 1980)). Thus, even though Reed's account of events was derived from information he had gleaned from others, his statements to the police support a finding of probable cause.

The statements of Mosley's codefendants all confirmed that Mosley was a member of the group that attacked Thomas, although they do not all say that Mosley actively participated in the beating. Wideman said that Mosley had been present when, before the attack, the group discussed the prospect of robbing someone and beating someone up; that Mosley was present at the scene of the murder; and that Mosley left the scene with the group after the attack and drank a bottle of pop that had been taken from Thomas. (R. 80, Facts ¶22; Ex. 10 ¶38; Ex. 10b at 5.) Frad Muhammad said that Mosley was part of the group, but said nothing about what Mosley did during the beating. (R. 98, Pl.'s Ex. 8.) Treadwell said that "My Guy" or "Frad's Friend" had hit Thomas. (R. 80, Facts ¶24; Ex. 4 ¶¶15-25.)

Viewing all of this evidence "as [it] would have appeared to a reasonable person in the position of [Defendant Detectives]," it is clear the detectives had probable cause to believe that Mosley was implicated in the murder of Howard Thomas. *See Mustafa v. City of Chicago*, 442

16

F.3d 544, 547 (7th Cir. 2006) (citations omitted). He arrived at and left the scene of the murder with a group of young men, at least some of whom robbed and murdered Thomas. Nearly all of the individuals questioned by the detectives either said that Mosley actively participated in the attack or did not say one way or the other what role he played. The differences between the various witnesses did not cast doubt on the existence of probable cause, even if they ultimately cast doubt on Mosley's guilt; the process of criminal adjudication was therefore the appropriate forum for further sifting of the evidence the detectives had gathered. *See Askew v. City of Chicago*, 440 F.3d 894, 896-97 (7th Cir. 2006) (discussing *Gramanos*, 797 F.2d 432).

Thus, Mosley has not established a genuine issue of material fact as to whether there was probable cause for his arrest and prosecution; the undisputed material facts establish that there was. *See Kim v. City of Chicago*, 858 N.E.2d 569, 575 (Ill. App. Ct. 2006) (court may find probable cause at summary judgment from undisputed facts); *see also Askew*, 440 F.3d at 897 (same). Since the existence of probable cause vitiates Mosley's malicious-prosecution claim, the court need not consider Defendants' contention that they did not "institute or continue" the criminal proceedings against Mosley. Defendants are entitled to summary judgment on Count II.

*Count III: State-Law Civil Conspiracy*

In Count III, Mosley brings a civil-conspiracy claim under Illinois law, so he must show "(1) an agreement; (2) by two or more persons; (3) to perform an overt act or acts; (4) in furtherance of the agreement/conspiracy; (5) to accomplish an unlawful purpose or a lawful purpose by unlawful means; (6) that causes injury to another." *Bressner v. Ambroziak*, 379 F.3d 478, 483 (7th Cir., 2004). The overt act or acts must be tortious or unlawful. *Id.* (citing *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994)). This claim fails for two reasons.

17

*First*, since Mosley lacks a viable due-process or malicious-prosecution claim, a reasonable jury could not find that he has suffered a legally cognizable injury. He endured a long and difficult pretrial detention, but not without due process or probable cause. Thus, it was undoubtedly a hardship, but it was not a legal injury—and that is fatal to his civil-conspiracy claim. *See Bressner*, 379 F.3d at 483 (injury required for civil-conspiracy claim). *Second*, at the close of discovery, the record is devoid of evidence that Defendant Detectives were parties to any agreement, explicit or implicit, to deny Mosley due process or institute criminal proceedings against him without probable cause. The record reveals nothing at all conspiratorial, nothing beyond the normal communication between detectives jointly investigating a homicide. This "complete failure of proof concerning an essential element of the nonmoving party's case" entitles Defendants to summary judgment on Count III. *See Celotex*, 477 U.S. at 323.

### *Count IV: State-Law Intentional Infliction of Emotional Distress ("IIED")*

In Count IV, Mosley brings an IIED claim under Illinois law. This claim is time barred. Illinois imposes a one-year statute of limitations for tort claims against governmental entities and their employers. 745 ILCS 10/8-101; *see Evans v. City of Chicago*, 434 F.3d 916, 934 (7th Cir. 2006). In *Evans*, the plaintiff brought state-law IIED and malicious-prosecution claims against a police officer, and the Seventh Circuit held that the IIED claim accrued at the "last confirmed interaction" between the officer and the plaintiff. *Id.* at 935; *see also Pavlik v. Kornhaber*, 761 N.E.2d 175, 186-89 (Ill. App. Ct. 2001) (claim accrues at time of defendant's "last act" of tortious conduct against plaintiff). Mosley incorrectly asserts that IIED claims based on facts alleged in parallel claims for malicious prosecution accrue only when state criminal proceedings are terminated. *Carroccia v. Anderson*, his authority for this proposition, was decided before *Evans*

18

and is no longer good law.  *See* 249 F. Supp. 2d 1016, 1028 (N.D. Ill., 2003).

Mosley does not dispute that his last interaction with any of the Defendant Detectives, other than court appearances, was in March 2000.  (R. 80, Facts ¶72.)  Since that was more than six years before he filed suit, the statute of limitations has run.

### *Counts V-VI: Derivative-Liability Claims Against the City of Chicago*

Mosley seeks recovery against the City of Chicago on the alternative grounds of *Monell* liability (Count V) and statutory indemnification (Count VI).  Since the Defendant Detectives are not liable to Mosley on any count, there is no basis for *Monell* liability, *see, e.g.*, *Williams v. Rodriguez*, 509 F.3d 392 (7th Cir. 2007), and no basis for indemnification under the Illinois Tort Immunity Act.  *See* 745 ILCS 10/2-109 (2004) ("A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable.").  The City of Chicago is therefore entitled to summary judgment on all claims.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED.

Enter:

/s/ David H. Coar

David H. Coar

United States District Judge

**Dated: September 22, 2009**