CERTIFIED COPY
A True Copy
Teste:



Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 09-3598

JOVAN MOSLEY,

*Plaintiff-Appellant,*

*v.*

THE CITY OF CHICAGO, a municipal corporation,
and Chicago Police Officers CLARENCE HILL,
DERAIL EASTER, CHARLES WILLIAMS, AND
EDWARD HOWARD, JR.,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06-c-6314—**David H. Coar,** *Judge.*

———————

ARGUED MAY 25, 2010—DECIDED JULY 29, 2010

———————

Before FLAUM, ROVNER and WOOD, *Circuit Judges.*

FLAUM, *Circuit Judge.*   This is an appeal from a grant
of summary judgment in favor of the defendants in a
§ 1983 action that arose from the arrest and prosecution
of plaintiff-appellant Jovan Mosley. Mosley was at the
scene when a group of individuals beat Howard Thomas

to death in 1999. Mosley arrived at the scene with the group that attacked Thomas and left the scene with the same group. Mosley and three other individuals were charged with Thomas's murder. After approximately five years in jail, Mosley was acquitted at trial. Shortly thereafter he filed this suit. Mosley's § 1983 claim centers around the allegation that the investigating officers withheld evidence of an exculpatory statement made by the key eyewitness during the line-up when this witness identified Mosley. We agree with the district court that the record does not support Mosley's due process violation claim or any of his related state law claims. We affirm.

## I.  Background

### A.  The Prosecution of Mosley in the Thomas Murder

Shortly after midnight on August 6, 1999, Howard Thomas was beaten to death near 7330 South Calumet Avenue in Chicago. Two teenage individuals, Jori Garth and Anton Williams, witnessed the attack. That evening, Garth and Williams were sitting on Garth's front porch. Frad Muhammad, Lawrence Wideman, Marvin Treadwell, Jovan Mosley and Gregory Reed approached the porch. Garth knew Treadwell and Reed socially. Reed, who had been drinking heavily, joined Garth and Williams on the porch while the others stayed at foot of the stairs. While the group was talking, Thomas walked by and someone in the group said, "there go the motherfucker right there." The group standing at the base of the stairs ran at Thomas. There is some testimony that Reed

initially ran out and quickly ran back to the porch. Eventually, the beating ended and Muhammad, Wideman, Treadwell, and Mosley all walked off together, leaving Thomas in a pool of his own blood. The police arrived shortly thereafter. Garth and Williams did not come forward as witnesses right away.

The police interviewed Garth and Williams about six months after the attack. Garth told the police about the group coming to her porch to talk with her and Williams. She said that shortly into the conversation Thomas walked by and three of the members of the group ran and attacked him. She said that a tall, light-skinned, black man was the one with the baseball bat and the other two individuals had braided hair. None of these descriptions fit Mosley. Mosley does not allege that the police withheld Garth's statement.

Williams also gave a statement to the police. He told the officers that five individuals came to the porch. He recognized Reed, Treadwell, and Muhammad. He did not recognize the other two individuals. Officers Charles Williams, Clarence Hill, and Edward Howard, Jr. testified that Anton Williams told them that everyone in the group except Reed attacked Thomas. After Williams gave his statement, the officers assembled a line-up with Mosley. Williams identified Mosley as having been on the scene of Thomas's murder. The officers did not create a report to document the line-up at that time. Fifteen months later, Detective Hill documented the line-up in vague and general terms. The report does not say precisely what role Mosley played in the attack, but it did

indicate that Williams identified Mosley as being involved in the murder in some fashion. This report was turned over to Mosley's attorney before trial. At his deposition in this case, Williams indicated that the report was a fair representation of the results of the line-up.

   In addition to giving his initial statement and iden- tifying Mosley in the line-up, Williams testified before the grand jury and at Mosley's trial. Before the grand jury Williams gave the following testimony:

> Q: After you heard somebody say that, what did you see then?
>
> A: They started beating on him.
>
> Q: When you say they, who specifically did you see?
>
> A: Frad, Marvin, Red.
>
> Q: And did you see where the fourth black male who you described to the Grand Jury, where did he go as those three people were beating on the victim?
>
> A: I didn't see him beat him, but he was around the area.
>
> Q: Did you see him where the three people that you knew were beating on the victim?
>
> A: Yes.
>
> Q: And was he down in that area?
>
> A: Yes.

At trial, Williams gave direct testimony consistent with his grand jury testimony. Then, on cross-examination

Williams agreed with a statement by defense counsel that one could interpret as making Mosley less culpable:

> Q: [Mosley is] the person you identified as having been out there but not having done anything, correct?
>
> A: Correct.
>
> Q: You never at any time told the police officers that Jovan Mosley did hit or strike or kick Mr. Thomas, did you?
>
> A: No. No.

Williams testified in his deposition that he told the officers that five men, including Mosley, attacked Thomas. Williams also testified that he consistently told the officers that Mosley was part of the group that ran toward Thomas but that he did not see Mosley throw any punches. Other than agreeing with defense counsel's statement on cross-examination, Williams never claimed to have definitively seen Mosley abstain from participation in the attack.

The detectives also took a statement from Reed. Reed implicated all four defendants in the attack. In the statement, Reed claimed that Mosley hit Thomas a couple of times. In discussing that statement during his deposition in this case, Reed stated that he had no independent recollection of what happened but provided the statement based on what he had heard from other individuals. Reed claimed that he told the officers of that fact before he gave the statement, but he did not acknowledge his lack of personal recollection in his statement. Reed gave deposition testimony that the officers did not tell him

what to say in his statement. On the eve of trial, Reed told the prosecutor, Andrew Varga, that he was drunk on the night of the incident and did not have any independent recollection of the event. At that time, Varga decided not to call Reed as a witness at trial. There is no information in the record regarding whether Varga ever informed Mosley's defense attorney about this discovery.

All of Mosley's co-defendants also implicate Mosley in the beating in some fashion. Muhammad said that Mosley was part of the group that attacked Thomas, but did not say what Mosley did in the beating. Wideman said that Mosley was part of the earlier discussions when the group planned to rob and beat someone. Wideman also said that Mosley was present at the scene of the beating and left with the group after the beating. Treadwell did not implicated Mosley by name, but did say that Frad's friend was the fifth member of the group and was one of the men who hit Thomas. Mosley also gave a statement implicating himself. Throughout his briefs, Mosley characterizes his statement as "a statement given after twenty-eight hours of being handcuffed to a wall in an interrogation room." However, the manner in which that statement was obtained is not challenged in this lawsuit.

Mosley's trial was originally scheduled for April 2000. However, by agreement of the parties, the court continued the trial until November 2005. Mosley remained in the maximum-security wing of the Cook County Jail while awaiting trial. In November 2005, Mosley was

acquitted by a jury. Wideman, Treadwell, and Muhammad
were convicted of first-degree murder.

## B.  Procedural History

Mosley filed this case against the City of Chicago,
Clarence Hill, Maverick Porter, Derail Easter, Charles
Williams, and Edward Howard, Jr. All of the individual
defendants are Chicago Police Department officers who
were involved in the investigation of the Thomas mur-
der. The initial complaint contained the following
claims: Count I—the defendants violated Mosley's due
process rights by withholding exculpatory evidence
and fabricating false reports; Count II—the defendants
falsely imprisoned Mosley; Count III—defendants
violated Mosley's right to equal protection of the laws;
Count IV—defendants conspired to deprive Mosley of
his constitutional rights; Count V—the defendants sub-
jected Mosley to malicious prosecution; Count VI—the
defendants engaged in a civil conspiracy; Count VII—the
defendants subjected Mosley to intentional infliction of
emotional distress; Count VIII— defendant City of
Chicago is bound by the doctrine of respondeat superior;
and Count IX—defendant City of Chicago is obligated
to indemnify the Chicago Police Officer defendants.

Defendants moved to dismiss all of the claims. Mosley
voluntarily dismissed the claims for false imprison-
ment, violation of equal protection, and conspiracy to
deprive Mosley of his constitutional rights. The district
court denied the motion to dismiss on all other counts.
Discovery ensued. Prior to the close of discovery, defen-

dants filed for summary judgment on the remaining
counts. Discovery continued while the motion for sum-
mary judgment was pending. At the close of discovery,
the district court granted defendants' motion for sum-
mary judgment on all remaining counts. The district
court found that the defendants did not violate
Mosley's due process rights because any failure to
disclose exculpatory evidence did not rise the level of a
*Brady* violation. The district court granted summary
judgment on the malicious prosecution claim because
it found that there was probable cause to proceed with
the prosecution. The district court found that without a
valid claim for the due process violation or the malicious
prosecution, the civil conspiracy claim could not stand
because there was no legally cognizable injury. The
district court granted summary judgment on the inten-
tional infliction of emotional distress claim because the
statute of limitations had run. Finally, the district court
found that the claims against the City of Chicago were
inapplicable because Mosley did not put forward any
valid claims against the individual officers. Mosley now
appeals the district court's grant of summary judgment
on the counts for denial of due process, malicious pros-
ecution, and civil conspiracy. He also asks us to
reinstate the claims against the City of Chicago if we
reinstate any of the claims against the individual defen-
dants.

## II. Discussion

We review a district court's grant of summary judg-
ment de novo. *Barricks v. Ely Lilly & Co.*, 481 F.3d 556, 559

(7th Cir. 2007). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[1] If the moving party meets this burden, the non-moving party must submit evidence that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 694 (7th Cir. 2006). The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Ptasznik*, 464 F.3d at 694.

---

[1] Mosley contends that the district court erred by formulating the test for summary judgment as "a party seeking summary judgment has the burden of showing that there are no genuine issues of material fact that would prevent judgment as a matter of law." Mosley claims that by formulating the test in this manner, the district court improperly intermingled the analysis of the record facts with the legal tests for prevailing as a matter of law. Tied to this claim, Mosley argues that the district court did not view the facts in the light most favorable to Mosley when granting summary judgment. This argument is without merit. The district court did not disregard the proper standard of review for summary judgment—it considered whether the record presented any issues of material fact with regard to the legal issues presented. There was no conflation or confusion of facts and the law. Furthermore, as defendants point out, we review a claim for summary judgment de novo, and therefore we review the record and legal issues anew.

## A.  Brady Violation Claim

The main issue in this appeal is whether the officers violated their duty under *Brady v. Maryland*, 373 U.S. 83 (1963), to turn over all exculpatory evidence and thereby violated Mosley's due process rights. Mosley claims Williams told the officers that he recognized Mosley from the group of individuals who beat Thomas to death but that Williams saw that Mosley did not participate in the beating. Mosley insinuates that there was an original line-up report created that contained that statement and the officers destroyed the report to keep it from Mosley's attorney. In the alternative, Mosley claims that the officers did not create the line-up report for fifteen months to hide the fact that Williams saw that Mosley did not participate in the beating. Additionally, Mosley claims that the officers committed a *Brady* violation by not informing Mosley's attorney that Reed was too drunk to have any independent recollection of the night.

We begin our analysis by determining what Mosley would need to show to prevail on a *Brady* due process violation claim. A *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused. *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006). The *Brady* duty extends to impeachment evidence as well as exculpatory evidence. *Id.* at 870. A defendant may demonstrate that a *Brady* violation has occurred by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the ver-

dict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). In granting summary judgment, the district court identified the logical tension inherent in claiming a *Brady* violation occurred when the predicate trial resulted in an acquittal—exclupatory evidence coming to light after the trial would reaffirm, not undermine, the confidence in a not guilty verdict. Several of our sister circuits have held that the standard set out in *Kyles* indicates that a trial that results in an acquittal can never lead to a valid claim for a *Brady* violation because the trial produced a fair result, even without the exculpatory evidence. *See Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999) ("Regardless of any misconduct by government agents before or during trial, a defendant who is acquitted cannot be said to have been deprived of the right to a fair trial."); *Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir. 1998) (finding no *Brady* violation in the face of an acquittal because *Brady* protects a defendant from an unfair trial and an acquitted defendant does not suffer the effects of an unfair trial); *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988) (holding that where criminal charges are dropped before trial, and thus the underlying criminal proceeding terminated in an appellant's favor, there is no injury caused by the act of suppressing exculpatory evidence). *But see Haupt v. Dillard*, 17 F.3d 285, 287-88 (9th Cir. 1994) (holding that where the trial judge was biased, defendant's acquittal speaks only to the amount of damages due and is irrelevant to whether he has a cause of action for a violation of his due process right to a fair trial). Our circuit has not directly resolved whether a plaintiff can assert

a claim for a *Brady* violation when the trial resulted in an acquittal. We were recently confronted with this issue in *Bielanski v. County of Kane*, 550 F.3d 632, 644 (7th Cir. 2008). However, we did not directly address the question because we found that even if we recognized a cause of action for a *Brady* violation when the trial results in an acquittal, the plaintiff in *Bielanski* would still have failed to state a claim. In coming to that conclusion, we set aside the issue of whether such a claim could potentially exist. We held that to state a Brady violation claim when the criminal trial ended in acquittal, if such a claim exists, the plaintiff would need to show that "the decision to go to trial would have been altered by the desired disclosure." *Bielanski*, 550 F.3d at 645 (citing *Carvajal v. Dominguez*, 542 F.3d 561, 570 (7th Cir. 2008)). Following *Bielanski*, we now ask whether there is any evidence in the record that would show: (1) that the officers withheld materially favorable evidence from Mosley, and (2) had the officers disclosed that evidence sooner, it would have altered the decision to go to trial. In other words, Mosley must show that if all parties had known of some piece of exculpatory evidence, the prosecution would not have moved forward with charges, the grand jury would not have indicted Mosley, or the trial court would have granted a motion to dismiss the indictment. Because Mosley cannot meet this bar, we reserve the question of whether our circuit recognizes a claim for a *Brady* violation when the trial results in an acquittal for a later case when this standard is met.

    There is no evidence in the record that the officers withheld any materially favorable piece of evidence.

Mosley contends that during the lineup identification
of him, Williams told the officers that he saw Mosley
during the attack and he saw that Mosley did not par-
ticipate in the beating; that the officers withheld that
information; and that this withholding amounts to a
Brady violation. Mosley does not contend that the
officers withheld Williams's initial statement to the
police or his grand jury testimony that he saw Mosley
in the area of incident but did not see Mosley participate
in the attack. Mosley stresses the distinction between
not seeing someone participate in a crime and seeing
someone not participate in the crime. Even if this distinc-
tion is meaningful, Mosley's claim fails because there is
no evidence that Williams told the officers that he saw
Mosley not participate in the beating that led to Thomas's
death. To support his claim, Mosley points our attention
to the cross-examination at trial where Williams replied
"yes" to the defense counsel's statement: "[Mosley is] the
person you identified as having been out there but not
having done anything, correct?" We agree with the district
court that Williams's one word answer to that leading
question must be interpreted in light of all of Williams's
testimony. This is not an impermissible credibility deter-
mination. It is a necessary interpretive step to give any
meaning to that piece of testimony. In every situation
where Williams articulated what he told the police
officers—his grand jury testimony, his direct examination
testimony at trial, and his deposition testimony in this
case—Williams consistently said that he told the officers
that he saw Mosley with the group that committed the
attack but did not see or could not remember seeing

Mosley participate. In light of the fact that he has consistently testified, both before and after the trial, that he told the officers that Mosley was in the area of the attack but that he did not know or did not see if Mosley participated, the one word answer on cross-examination cannot create a genuine issue of material fact on this issue. Mosley also points to the fifteen-month delay in the creation of a lineup report as evidence that the officers were intentionally withholding information. While fifteen months is an unusually long delay for the creation of a report, there is no evidence that the delay was the result of anything other than an oversight.

Even if we were to determine that Williams's agreement on cross-examination creates an issue of material fact as to whether or not Williams ever told the officers that he saw Mosley not participate in the beating, this withholding would not rise to the level of a Brady violation under the standard we set forth in *Bielanski* because it would not have altered the prosecution's decision to go to trial. The prosecutor testified at his deposition that he moved forward against Mosley on an accountability theory of murder. To purse the accountability theory of murder, the state did not need to show that Mosley actively participated in the beating. Instead, the state needed to show that Mosley, with the intent to promote or facilitate the attack, solicited, aided, abetted, agreed or attempted to aid, others in the attack. 21 Tracy Bateman & Susan L. Thomas, *Ill. Law and Prac. Homicide* § 9 (2010). Williams's alleged statement would not have changed the viability of this theory of criminal liability for Mosley. Taking Mosley's most favorable formulation of

Williams's testimony, Williams saw Mosley with the group who carried out the attack and saw Mosley in the area of the attack. Wideman stated that Mosley participated in earlier discussions planning to attack, beat, and rob an individual. After the attack, Mosley left with the group of perpetrators. This evidence would have been sufficient for the prosecutor to pursue the accountability theory of murder under Illinois law.

Mosley also contends that the officers committed a Brady violation by withholding the evidence that Reed was "drunk as hell" on the night of the incident and had no independent recollection of the incident. Mosley argues that this is impeachment evidence and therefore *Brady* material that should have been disclosed. This argument fails because the state did not call Reed at trial and therefore the state had no obligation to turn over evidence that could impeach his testimony. Furthermore, the prosecution did decide to move forward with the trial even after learning this fact. Therefore, even assuming that a *Brady* violation could occur when a trial ends in acquittal, this claim cannot rise to the level described in *Bielanski*.

**B. Malicious Prosecution Claim**

In order to prevail on a malicious prosecution claim under Illinois law, the plaintiff must prove: (1) the commencement or continuance of judicial proceedings by the defendant against the plaintiff; (2) a lack of probable cause for those proceedings; (3) malice in instituting the proceedings; (4) termination of the proceedings in

the plaintiff's favor; and (5) damages resulting to the plaintiff. The district court concluded that the defendants had probable cause to press forward with the prosecution and therefore Mosley could not maintain a claim for malicious prosecution. Probable cause is defined as "a state of facts that would lead a person of ordinary caution and prudence to believe, or to entertain an honest and strong suspicion, that the person arrested committed the offense charged." *Reynolds v. Menard, Inc.*, 850 N.E.2d 831, 837 (Ill. App. Ct. 2006).

Mosley erroneously claims that the district court impermissibly weighed the credibility of the witnesses in determining that the officers had probable cause. We look to the totality of the circumstances when considering whether the officers had probable cause to arrest and initiate proceedings against a defendant. *Illinois v. Gates*, 462 U.S. 213, 231 (1983). In finding that the officers had probable cause, the district court relied on the testimony of the officers and Williams that Williams told the officers Mosley was in the group that attacked Thomas and Reed's statement to the officers that he heard Mosley had been a part of the attack. Although Reed's hearsay statements would not have been admissible at trial, they can still serve as a basis for probable cause when considered with the other evidence. *See Ebert v. Gaetz*, ___ F.3d ___, 2010 WL 2508771 (7th Cir., June 23, 2010) ("probable cause to arrest can rest upon information that would not be admissible at trial, such as hearsay, if the information is supported by some indicia of reliability."). In addition to Reed and Williams's statements, the officers also acted on the

statements of Muhammad, Wideman, and Treadwell, all
of which implicated Mosley. While Mosley is correct to
argue that the testimony of confederates is not always
the most credible in front of a jury, it certainly can be
credited in forming the basis for probable cause.

## C. Civil Conspiracy Claim

Lastly, Mosley claims that the district court erred in
granting summary judgment on his civil conspiracy
claim. To show a civil conspiracy, Mosley must show
an agreement to accomplish either an unlawful purpose
or a lawful purpose by unlawful means. *McClure v. Owens
Corning Fiberglass Corp.*, 720 N.E.2d 242, 258 (Ill. 1999).
Mosley must show that each of the defendants "know-
ingly and voluntarily participated in a common scheme
to commit an unlawful act or a lawful act in an
unlawful manner." *Id.* Proof of accident or negligence is
not enough. *Id.* Mosley does not point to any evidence
of a common scheme. Instead, Mosley points to allega-
tions he made in his complaint. This is not the proper
standard for summary judgment. At this stage, Mosley is
required to offer support for those allegations. In place
of evidence, Mosley points to the absence of reports from
his interrogation and the line-up. He is correct that
this indicates an oversight by the police officers in
this case. However, without more, this omission
does not amount to evidence of conspiracy to obtain an
unlawful result or to obtain a lawful result through
unlawful means.

### III. Conclusion

For the reasons set forth above, we AFFIRM the district court's grant of summary judgment on all claims.